604 So.2d 515 (1992)
STATE of Florida, Appellant,
v.
John M. GERREN, Appellee.
No. 91-1723.
District Court of Appeal of Florida, Fourth District.
July 8, 1992.
Rehearing and/or Clarification Denied September 30, 1992.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Richard L. Polin, Asst. Atty. Gen., Miami, for appellant.
J. David Bogenschutz of Kay, Bogenschutz and Dutko, P.A., Fort Lauderdale, for appellee.
PER CURIAM.
The state appeals an order granting appellee's motion to dismiss Count I of an amended information which charged him with unlawful compensation. We reverse and remand.
Appellee was charged by amended information with unlawful compensation and perjury in a nonofficial proceeding after appellee's codefendant Louis Stramaglia entered into a plea agreement and became a witness for the state against appellee. In Count I of the amended information, the state alleged that while serving as Executive Director of the Broward County Expressway Authority, appellee
[D]id unlawfully request, accept, or agree to accept from Louis "Butch" Stramaglia, or employees of Vito's Trucking & Excavating Company, Inc., pecuniary or other benefits not authorized by law, to wit: approximately fifteen (15) rolls of fence, and/or United States currency, and/or repairs on a Ford tractor, for the past, present, or future performance, or non-performance, of official acts or omissions which Louis "Butch" Stramaglia believed to have been, or JOHN M. GERREN, JR. represented as having been, either within the official discretion of JOHN M. GERREN, JR., in violation of his public duty, or in performance of his public duty, to wit: while serving in the capacity of Executive *516 Director of the Broward County Expressway Authority, JOHN M. GERREN, JR., did exercise his official authority, discretion or influence on behalf of Vito's Trucking & Excavating Company, Inc. during the construction of Section One of the Sawgrass Expressway, contrary to F.S. 838.016(1).
Appellee filed an amended sworn motion to dismiss the complaint, alleging that Stramaglia's deposition testimony established that appellee did not refrain from any official duty and gave no special treatment in return for any alleged "gratuity" offered by Stramaglia. In his memorandum of law in support of the motion, appellee alleged that the state had failed to demonstrate the existence of a specific quid pro quo.
The state's demurrer and memorandum of law in response to appellee's sworn motion to dismiss alleged that during the course of the construction of the Sawgrass Expressway, appellee, on behalf of the Expressway Authority, made certain decisions and settled claims that Stramaglia felt were favorable to Vito's Trucking. Beginning in approximately December 1986, Stramaglia gave appellee both an envelope containing $5,000 cash and approximately fifteen rolls of fencing and authorized his mechanics to perform over $740 worth of engine repairs on appellee's tractor. The state claimed that Stramaglia stated at deposition that he gave those items to appellee as a gesture of "goodwill" because appellee treated Vito's Trucking fairly on the job and settled Vito's claims justly. When Stramaglia gave appellee the $5,000, Vito's Trucking had several hundred thousand dollars worth of claims pending before the Expressway Authority. Stramaglia testified that he gave those items to appellee so that the goodwill would continue.
The state conceded that Stramaglia testified that he never asked appellee to act or refrain from acting in a certain manner and that appellee never stated that he would refrain from action regarding any official decision he would have to make as Executive Director of the Expressway Authority. When Stramaglia was asked whether he gave appellee the $5,000 in exchange for anything appellee did, Stramaglia responded, "Not specifically but we had a lot of claims in; you know?"
In its memorandum of law, the state asserted that there were sufficient factual allegations from which a reasonable person could conclude that appellee knew that the items in question were given to him for the purpose of influencing his official behavior toward Vito's Trucking on matters that were pending before the Expressway Authority or that would arise in the future. The state maintained that the "totality of the circumstances" demonstrated the existence of a quid pro quo. The state argued that "it should not be necessary to prove that any particular words were spoken by the participants in the giving or receiving of unlawful gratuities in order to establish that a quid pro quo has been agreed upon."
On June 7, 1991, the trial court entered an order dismissing the charge of unlawful compensation and transferring the remaining perjury charge, a misdemeanor, to county court. The trial court's factual findings were virtually identical to those contained in the state's demurrer. The trial court concluded that the state needed to demonstrate an "explicit quid pro quo" and had failed to do so, basing these conclusions on Shields v. Smith, 404 So.2d 1106 (Fla. 1st DCA 1981), rev. denied, 412 So.2d 470 (Fla. 1982), and McCormick v. United States, ___ U.S. ___, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991). We disagree.
In Count I of the information, the state alleged that appellee violated section 838.016, Florida Statutes (1989). That section provides in pertinent part as follows:
(1) It is unlawful for any person corruptly to give, offer, or promise to any public servant, or if a public servant, corruptly to request, solicit, accept, or agree to accept, a pecuniary or other benefit not authorized by law, for the past, present, or future performance, non-performance, or violation of any act or omission which the person believes to have been, or the public servant represents as having been, either within the official discretion of the public servant, *517 in violation of a public duty, or in performance of a public duty. Nothing herein shall be construed to preclude a public servant from accepting rewards for services performed in apprehending any criminal.
§ 838.016(1), Fla. Stat. (1989). In section 838.014(6), Florida Statutes (1989), the legislature defines the term "corruptly" as follows:
"Corruptly" means done with a wrongful intent and for the purpose of obtaining or compensating or receiving compensation for any benefit resulting from some act or omission of a public servant which is inconsistent with the proper performance of his public duties.
In State v. Milbrath, 527 So.2d 864, 865 (Fla. 5th DCA 1988), the court interpreted section 838.016(2), Florida Statutes, concerning unlawful compensation for the past, present, or future exertion of any influence upon or with any other public servant, and found that "there must be a showing that the public official acted as prohibited by the statute, as a quid pro quo for receipt or expectation of receiving an illegal benefit." As framed by the parties, the issue before this court is whether the state must show an explicit agreement on the part of the public official or whether the jury could infer, from the totality of the circumstances, that there was an implicit understanding that the official would act or refrain from acting in a particular manner in exchange for certain benefits.
In Shields, the defendant, former Executive Director of the Florida Department of Natural Resources (DNR), was convicted on three counts of violating the Hobbs Act, 18 U.S.C. § 1951.[1] The jury found that the defendant and a real estate broker attempted to obtain money to which they were not entitled from another broker whose clients wanted to sell certain properties to the state under DNR's program for the acquisition of environmentally endangered lands. The indictment alleged that the defendant conspired and attempted to obtain money by extortion "under color of official right" in consideration for the defendant's official acts so that the defendant would suspend his independent judgment when considering the recommendation of the purchase of certain lands.
The issue before the court was whether those convictions required forfeiture of the defendant's state retirement benefits. Section 121.091(5)(f), Florida Statutes, forfeited benefits otherwise payable to a member of the state retirement system who is found guilty of specified crimes committed before retirement, including bribery in connection with the employment, or other felonies specified in chapter 838. The Shields court affirmed the trial court's finding that the acts charged, for which the defendant was found guilty, constituted "requesting or soliciting unlawful compensation for official behavior, a third degree felony proscribed by section 838.016(1), Fla. Stat. (1979)." Shields, 404 So.2d at 1109.
In the instant case, the trial court relied on Shields for the proposition that the elements required to establish a violation of both section 838.016 and the federal Hobbs Act were "virtually identical," requiring that a "quid pro quo be established in exchange for official behavior." Having decided that the elements of the two offenses were identical, the trial court relied on the recent Supreme Court decision in McCormick and determined that an explicit quid pro quo is required under section 838.016.
In McCormick, a West Virginia legislator was the leading advocate of a legislative program allowing foreign doctors to practice under temporary permits while studying for state licensing exams. The legislator sponsored a bill, sought by an organization of doctors, extending the program's expiration date and later agreed to *518 sponsor legislation that would grant the doctors a permanent license by virtue of sufficient experience without having to pass the state examinations. After advising the doctors' lobbyist during his reelection campaign that he had not heard from the doctors, the legislator received four cash payments. He did not list these payments as campaign contributions nor did he report them as income on his federal income tax return. The legislator received one more payment after the West Virginia legislature enacted the permanent licensing program.
The legislator subsequently was indicted on five counts of violating the Hobbs Act, by extorting payments under color of official right, and one count of filing a false income tax return. At trial, the jury was instructed that (1) extortion under color of official right does not occur when a public official receives a legitimate gift or voluntary political contribution, (2) a voluntary payment is one that is freely given "without expectation of benefit," and (3) a voluntary political contribution is not taxable income, provided that the contribution is used for campaign purposes. The legislator was convicted of one Hobbs Act count and the tax violation. The Court of Appeals affirmed the convictions, finding that an elected official's conviction under the Hobbs Act does not require proof of a quid pro quo  a payment made in return for an explicit promise or undertaking by the official to perform an official act  unless the payments are "legitimate" campaign contributions. The Court of Appeals listed seven factors to be considered in determining whether the parties ever intended the payments to be legitimate campaign contributions and found that the parties never so intended.
The legislator's challenge to the judgment affirming his convictions was limited to the Court of Appeals' rejection of his claim that the payments made to him by the doctors were campaign contributions, the receipt of which did not violate the Hobbs Act. The Supreme Court noted that the legislator did not "challenge any rulings of the courts below with respect to the application of the Hobbs Act to payments made to nonelected officials or to payments made to elected officials that are properly determined not to be campaign contributions." McCormick, ___ U.S. at ___, 111 S.Ct. at 1814, 114 L.Ed.2d at 323. Therefore, the Court expressly declined to consider how the "under color of official right" phrase is to be interpreted in those contexts. Id.
The Court first found that the Court of Appeals affirmed the legislator's convictions on legal and factual grounds that were never submitted to the jury when it announced a rule of law for determining when payments are made under color of official right and found sufficient evidence to support its extortion findings. Even if the Court of Appeals was correct on the law, the judgment should have been set aside and a new trial ordered because matters of intent are for the jury to consider. Id. at ___, 111 S.Ct. at 1815, 114 L.Ed.2d at 324.
In directly addressing the quid pro quo requirement, the Court found that even assuming an unfavorable response to all seven of the Courts of Appeals' inquiries, the facts of the case did not support a violation of the Hobbs Act. Id. at ___, 111 S.Ct. at 1816, 114 L.Ed.2d at 325. The Court reasoned that serving constituents and supporting legislation that will benefit those within the district is the everyday business of all legislators. Campaigns must be run and financed and money is constantly being solicited on behalf of candidates. Therefore, the Court concluded that whatever appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of their constituents shortly before or after campaign contributions are solicited and received "is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another with his consent, `under color of official right.'" Id. at ___, 111 S.Ct. at 187, 114 L.Ed.2d at 325. Such conduct is unavoidable so long as election campaigns are financed by private contributions or expenditures. Id.
*519 The Court stated that it was not holding that it is impossible for an elected official to commit extortion in the course of financing an election campaign. Such contributions could be violative of the Hobbs Act only where the facts demonstrate an explicit quid pro quo:
Political contributions are of course vulnerable if induced by the use of force, violence, or fear. The receipt of such contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations, the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

Id. at ___, 111 S.Ct. at 1816, 114 L.Ed.2d at 326 (emphasis added). A campaign contribution cannot form the basis of a Hobbs Act prosecution unless it can be proven to have been given in return for the performance of or abstaining from an official act. Id. at ___, 111 S.Ct. at 1817, 114 L.Ed.2d at 326. Accordingly, the Court disagreed with the Court of Appeals' holding that a quid pro quo was not necessary for conviction under the Hobbs Act when an elected official receives a campaign contribution. The Court again explicitly noted that it was not deciding whether a quid pro quo requirement exists in other contexts. Id. at ___, 111 S.Ct. 1817 n. 10, 114 L.Ed.2d at 326 n. 10.
As the state contends, the Supreme Court's holding in McCormick was expressly conditioned on the legislator's status as an elected official in receipt of campaign contributions. The Court emphasized the nature of the American political process, in which constituents routinely contribute financial support to candidates who have furthered their interests or are likely to do so in the future. Because private contributions form an integral part of this process, an official in receipt of contributions cannot be prosecuted under the Hobbs Act absent an "explicit promise" by the official to perform or not to perform an official act. The Court clearly was concerned about government attempts to criminalize legitimate contributions. In United States v. Garcia, 774 F. Supp. 848, 849 (S.D.N.Y. 1991), the court held that there was no quid pro quo requirement to prove extortion under "color of official right" in a case involving an alleged request for a consulting job for a spouse and an alleged interest free loan funneled through a relative. The court declined to extend McCormick because the case before them "[did] not involve conduct that ha[d] long been thought to be lawful or conduct `unavoidable' in election campaigns financed by private contributions or expenditures." Id.
In the instant case, appellee was an appointed official; therefore he was not involved in the solicitation of financial support. Nonelected officials have no need for such support and the receipt of such funds has no legitimate public purpose. As the state contends, the very acceptance of such funds creates a conflict of interest and an appearance of impropriety. Furthermore, the McCormick Court specifically stated that it was not deciding whether an explicit quid pro quo was required for violation of the Hobbs Act by a nonelected official. Similarly, the Court noted that federal appellate decisions conflict as to whether the public official must "induce" the payor's consent by some affirmative act such as demand or solicitation. McCormick, ___ U.S. at ___, 111 S.Ct. at 1813 n. 5, 114 L.Ed.2d at 322 n. 5. The Court declined to resolve that conflict as well.
Appellee argues that if an explicit quid pro quo is required when an elected official receives payments in exchange for his past, present, and future support of certain legislation, such a showing should definitely be required in the instant case. Appellee asserts that if there was no "appearance of impropriety" in the payment for vote scenario in McCormick, one cannot exist under the facts of the instant case. However, as previously discussed, the McCormick Court based its holding on the fact that fund raising in an integral part of the *520 political process. Elected officials must solicit contributions from their constituents. The appointed Executive Director of the Broward County Expressway Authority does not have any such similar need.
Appellee also asserts that if the state need only demonstrate an implicit quid pro quo, every gift given to a public official would be subject to sanctions. Appellee argues that a quid pro quo can always be shown by suspicion; consequently, using the state's interpretation, innocent and well meaning acts would be translated into criminal accusations.
Under appellee's interpretation of the statute, a nonelected public official could receive funds or other benefits from interested persons so long as he never explicitly promises to perform his public duties improperly. The state poses an interesting hypothetical involving the submission of bids by a contractor. A contractor submits a bid along with a cash payment that is received by a nonelected public official charged with making the decision. After the official accepts the bid, the contractor sends him another cash payment. Assuming this scenario continues for five more public bids, there has not been any explicit promise or explicit quid pro quo between the parties. If auditors later discover that these bids were not the lowest and could not be justified on any other grounds, under appellee's interpretation, the public official could not be prosecuted because of the lack of an explicit promise. When applied in this manner, such an interpretation defies logic and effectively could relegate government control to the highest secret bidder.
As the state asserts, prosecutions involving nonelected public officials on the basis of an implicit agreement would retain the same procedural safeguards as any other criminal proceeding. The state would be required to demonstrate the existence of an implicit quid pro quo through circumstantial evidence. "The element of intent, being a state of mind, often can only be proved by circumstantial evidence." State v. Waters, 436 So.2d 66 (Fla. 1983). For example, in Waters, the court upheld the defendant's conviction for attempted burglary even though the direct evidence established only that the defendant was trying to break into a padlocked room with a pair of pliers. The court found that the state presented sufficient circumstantial evidence, e.g., the presence of property or goods available to be stolen, from which the jury could conclude that the defendant attempted to enter with the intent to commit theft. Id. at 71-72. Similarly, a jury in the instant case could infer that although appellee never explicitly promised to act in a specified manner, his acceptance of various gifts from Stramaglia influenced the performance of his official duties, i.e., his decision on various claims Vito's Trucking had before the Expressway Authority.
When the only proof of guilt is circumstantial, the state must, of course, introduce competent evidence which is inconsistent with the defendant's theory of events. See generally State v. Law, 559 So.2d 187 (Fla. 1989). Furthermore, at least one court has upheld a conviction pursuant to section 838.16(1) based on circumstantial evidence. In Merkle v. State, 512 So.2d 948 (Fla. 2d DCA 1987), approved, 529 So.2d 269 (Fla. 1988), the court found that there was sufficient circumstantial evidence from which the jury could have found that the defendant judge accepted a bribe in connection with his disposition of a criminal case; consequently, the court affirmed his convictions for bribery, receiving unlawful compensation, extortion by a state officer, and misbehavior in office.
In conclusion, the trial court erroneously applied the principles set forth in McCormick to the facts of the instant case. While it may be necessary for the state to show an "explicit quid pro quo" when it seeks to prosecute an elected official in receipt of campaign contributions for the crime of unlawful compensation, such a showing should not be necessary in a case involving an appointed public official not involved in fund raising. While the state must show a quid pro quo, it should be permitted to establish this element indirectly, *521 through the use of circumstantial evidence.
GLICKSTEIN, C.J., and DOWNEY and WARNER, JJ., concur.
NOTES
[1] 18 U.S.C. § 1951 provides in relevant part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce ... by robbery or extortion . .. in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years or both.
(b) As used in this section 
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.