UNITED STATES of America, Plaintiff–Appellee,

v.

Raul MARTINEZ, Defendant–Appellant.

Nos. 91–5619, 92–4668.

United States Court of Appeals, Eleventh Circuit.

Feb. 2, 1994.

James Jay Hogan, Evelyn L. Greer, Hogan, Greer & Shapiro, G. Richard Strafer, Quinon & Strafer, P.A., Miami, FL, for defendant-appellant in No. 91–5619.

Linda Collins Hertz, Harriett R. Calvin, Barbara A. Ward, Steven E. Chaykin, Bruce L. Udolf, Asst. U.S. Attys., Miami, FL, for plaintiff-appellee in No. 91–5619.

James J. Hogan, Hogan, Greer & Shapiro, G. Richard Strafer, Quinon & Strafer, Miami, FL, for defendant-appellant in No. 92–4668.

Roberto Martinez, U.S. Atty., Steven E. Chaykin, Linda Collins Hertz, Harriett R. Calvin, Barbara A. Ward, Bruce L. Udolf, Asst. U.S. Attys., Miami, FL, for plaintiff-appellee in No. 92–4668.

Before HATCHETT and ANDERSON, Circuit Judges, and YOUNG *, Senior District Judge.

HATCHETT, Circuit Judge:

Because the jury considered extrinsic materials during its deliberations and received improper instructions, we reverse this case and remand it to the district court for a new trial.[1]

## FACTS

The voters of the city of Hialeah, Florida, elected Raul Martinez mayor in 1981 after he had served on the city council. The city council of Hialeah, comprised of seven voting members, regulated zoning and land use and bore responsibility for granting variances and rezoning permits. As mayor, Martinez had the authority to veto any ordinance the city council passed. In addition to being mayor, Martinez was a registered real estate broker, through his company, Martex Realty, Inc., and operated a Spanish language newspaper.

In 1981, following Martinez's victory in the mayoral election, Silvio Cardoso, a land developer, approached Martinez in an attempt to forge a political alliance. From 1981 until 1987, Martinez participated in various real estate transactions involving Cardoso, Renan Delgado, and Jose Portnoy, and in doing so significantly increased his net worth. His

---

* Honorable George C. Young, Senior U.S. District Judge, Middle District of Florida, sitting by designation.

1. At the time of this trial, the district court did not have the benefit of the Supreme Court's recent decision in *Evans v. United States*, —— U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992).

involvement in seven of these transactions provides the basis for the criminal charges in this case.

### Esperanza Project

In Racketeering Act No. 1, the government alleged that Martinez committed extortion when he attempted to funnel a federally funded housing project to developer Camilo Padreda. Specifically, the government alleged that between December, 1981, and March, 1983, Martinez conspired with Hialeah Housing Authority (HHA) commissioner Antonio Cardona to award the project to Padreda despite Padreda's inferior proposal. At trial, Padreda testified that Martinez demanded $150,000 for his assistance, but that he never paid the money and ultimately withdrew the proposal. The jury acquitted Martinez on this charge.

### Marivi Gardens

In 1983, Silvio Cardoso invited Martinez to "participate" in Marivi Gardens, a low cost housing development consisting of twelve substandard lots. To obtain the appropriate variances and city council approval for rezoning, Cardoso sought Martinez's help, in exchange for one of the lots. After discussions with Martinez, Cardoso obtained the variances, obtained rezoning, and purchased the lots. In mid–1984, Cardoso delivered to Martinez the deed to an enlarged lot in Marivi Gardens. Although Cardoso transferred the lot to Martinez for cost, losing a potential $15,000 profit, he testified that he gave the lot as a gift. Martinez's involvement in Marivi Gardens constituted Racketeering Act No. 2.

### Danielle Marie Gardens— Abida Subdivision

Martinez's involvement in Marie Gardens supplied the basis for Racketeering Act No. 3, constituting Counts III and IV of the indictment. In late 1983, Cardoso began negotiations to purchase forty-two lots in the Danielle Marie Gardens subdivision for $600,000. To close the deal, Cardoso needed to re-plat the forty-two lots and rezone a portion from residential to retail commercial. Before Cardoso obtained the variances, Martinez informed Cardoso that he wished to purchase ten of the lots at cost. Although Cardoso wanted a higher price for the lots, he acceded to Martinez's request, losing almost $70,000 in profit. Ultimately, the city council passed, and Martinez signed, the rezoning ordinances. In November, 1984, Cardoso sold Martinez's ten lots for $30,000 each, making Martinez a $70,000 profit.

### Las Palmas

The allegations supporting Racketeering Act No. 4, Count V of the superseding indictment, involved Cardoso's purchase of "Las Palmas" from Jose Portnoy. After Martinez expressed his desire to "participate" in this development, Cardoso purchased the property and built a sixteen unit condominium. Thereafter, Cardoso sold all of the units in the condominium development and paid Martinez $32,000, because Martinez agreed to act as Cardoso's partner in a separate, unrelated Housing and Urban Development (HUD) project. Although HUD failed to award the project to Cardoso, he never asked Martinez to return the money from the Las Palmas project. The jury acquitted Martinez of this count.

### Steve's Estates

Racketeering Act No. 5 alleged that in 1983, Martinez paid $10,000 below market price to developer Renan Delgado for two lots in the Steve's Estates Subdivision in return for his agreement not to interfere with Delgado's proposed zoning legislation before the city council. After obtaining a purchaser of one of the lots for Delgado, Martinez directed Delgado to sell him two of the lots for a discounted price, which Delgado agreed to do. Before Delgado obtained rezoning approval, however, Martinez informed him that he could not pay the purchase price of $125,000. Thus, Delgado allowed Martinez to pay for the lots with a $5,000 cash deposit and an unsecured note, payable in one year. Martinez never paid the deposit. After the city council passed the rezoning ordinance, but before he signed it, Martinez closed the deal with Delgado, unilaterally changing the terms of their agreement. Ultimately, Martinez defaulted on the debt.

## Delgado Subdivision

Racketeering Act No. 6, constituting Counts VI and VII of the superseding indictment, involved Delgado's development of a second subdivision in March, 1984, with his partner, Jose Portnoy. During the rezoning process, Delgado told Portnoy they would have to sell Martinez some of the lots at cost. With Martinez's help, in spite of public opposition, Delgado and Portnoy secured rezoning two weeks after Martinez purchased the lots at cost. Later, at Martinez's direction, Delgado and Portnoy sold a third lot at cost to Councilman Ray Robinson, a close friend of Martinez's. Although Martinez made a $45,000 profit, Portnoy and Delgado lost between $30,000 and $40,000 on the sales of the three lots.

## Sevilla West

Racketeering Act No. 7, constituting Count VIII of the superseding indictment, alleged that developer Santiago Alvarez agreed to sell Martinez two lots in his Sevilla West development at a reduced price, to prevent Martinez from vetoing the rezoning. After the council overwhelmingly approved Alvarez's rezoning proposal, Martinez vetoed it, causing Alvarez and his partner, Mario Farrell, to lose $400,000. When Alvarez and Farrell reapplied for rezoning, they agreed to sell Martinez two lots for $175,000, $55,000 less than the bank's appraisal of the property. Thereafter, Martinez withdrew his opposition to the requested rezoning and supported the changes when they came before the council. The jury acquitted Martinez of this count.

To rebut the government's charges of extortion, racketeering, and bribery, Martinez sought to establish that he never threatened any of the alleged victims of the extortion, and never requested nor offered any help to secure rezoning in exchange for favorable terms in real estate ventures. To bolster his defense, Martinez demonstrated that Florida law permits politicians to maintain business interests outside their public offices. Finally, Martinez sought to show that he received favorable terms in business transactions only because developers and politicians sought to maintain positive relations with him.

## PROCEDURAL HISTORY

On December 4, 1990, a federal grand jury for the Southern District of Florida returned an eight count superseding indictment against Martinez. Count I alleged a RICO conspiracy in violation of 18 U.S.C. § 1962(d) between November, 1981, and July, 1987; Count II alleged a substantive RICO violation under 18 U.S.C. § 1962(c); and Counts III–VIII alleged extortion "under color of official right" in violation of the Hobbs Act, 18 U.S.C. § 1951. The RICO counts alleged the seven racketeering acts summarized above, each of which was described alternatively as one of several subpredicate acts. The extortion charges related to four of those transactions.

Following an eight-week trial, which began January 21, 1991, a jury found Martinez guilty of Counts I through IV, VI, and VII, and acquitted him of Counts V and VIII. The district court employed special verdict forms for Counts I and II to establish the predicate and subpredicate racketeering acts. The jury found Martinez committed only four of the seven alleged acts.

Following his conviction, Martinez filed motions for a new trial alleging jury misconduct and error in the jury instructions. The district court denied the motions and sentenced Martinez to six concurrent terms of ten years imprisonment on each count of conviction. The district court also denied Martinez's two motions for a new trial based on newly discovered evidence.

## CONTENTIONS OF THE PARTIES

Martinez contends that he is entitled to a new trial because extrinsic influences entered into the jury's deliberations, infecting the process and causing him prejudice. He also contends that the district court's instruction on extortion, bribery, and unlawful compensation were legally insufficient because they did not contain a *quid pro quo* requirement stating that a public official must accept money in return for a requested exercise of official power. The government contends that insufficient evidence exists to show that the jurors' exposure to extrinsic materials preju-

diced Martinez, and that the jury instructions accurately stated the law of extortion because an explicit *quid pro quo* is not required.[2]

## ISSUES

We address two issues: (1) whether the district court abused its discretion in denying Martinez a new trial based on the jury's exposure to extrinsic evidence during its deliberations; and (2) whether the district court's instructions on extortion, bribery, and unlawful compensation correctly informed the jury on the elements of the offenses.

## DISCUSSION

### A. Extrinsic evidence in the jury room

The jury began deliberating on Monday, March 18, 1991. On Wednesday morning, March 20, 1991, the jury foreperson, Juror No. 2, Maryanne Foust, sent the district court a note that stated:

> [Y]esterday afternoon it came to our attention that one of the jurors saw a newspaper article and heard conversation about this case that indicated the possible length of the sentencing and the fact that all the witnesses who plea bargained got away with it. Why shouldn't he, Raul Martinez[?]
>
> They were asked if what they read had prejudiced them in this case and had they already made up their mind. The answer was no. However, comments have been made to indicate otherwise. I have pondered this matter at length and in all fairness to the government and the defense, believe that the decision to continue must be made by the court.

After consulting counsel, the district court questioned Juror Foust about the note. Foust stated that Juror No. 8, Judy Tomeny, commented about an article she saw indicating Martinez could receive up to 160 years in prison if convicted, and that Tomeny believed the government had granted so many plea bargains to its witnesses that it would be

unfair to convict Martinez. Foust also reported that she and other jurors discussed Tomeny's conduct and opinion with her in front of all the jurors. Foust also stated that she believed Tomeny influenced at least one other juror, and that the jurors argued the entire day of March 19, and all morning on March 20 with some jurors accusing Tomeny of harboring prejudice against the government.

Based on its colloquy with Juror Foust, the district court decided to question all the jurors, except Juror Tomeny. Upon questioning, Juror No. 1, Lavances Wright, stated that she heard Juror Tomeny's remark about the maximum sentence and recalled other jurors saying that such a remark should not be considered. Wright described the exchange which ensued as a "heated argument" with the jurors accusing Tomeny of not disclosing her prejudice against the government to the district court. Wright also stated that Tomeny expressed concern that Martinez was the "only person who would be paying for it" due to the government's plea agreements.

After answering the questions concerning Juror Tomeny's conduct, Juror Wright unequivocally stated that she could not be fair and impartial: "I think it has affected me. I would be very concerned about being, you know, able to give justice." Following this exchange, Martinez renewed his motion for a mistrial. Based on Juror Wright's answers, the government asserted that it was unclear whether she could deliberate in an unbiased manner, and asked to question her directly. With the court's permission, the prosecutor asked Juror Wright whether she could put aside what she heard from the other jurors, follow the court's instructions, and decide the case on the evidence introduced at trial. Again, Juror Wright expressed her inability to do so: "This came up in the deliberations yesterday, and I thought that I could, but after last night trying to have slept, and the restless night, I can't. I wouldn't be able to do it."

---

2. Additionally, Martinez contends that the government did not introduce sufficient evidence to support his convictions and that the United States Attorney's significant conflicts of interest violated his right to due process. Because we conclude that Martinez is entitled to a new trial based on juror misconduct and erroneous jury instructions, we do not address these issues.

Following Juror Wright's testimony, the district court addressed the government's concern that the court was "throwing away a two-month trial based on the inquiry of one juror," stating: "We have one juror we know can't be a good judge, and we have another juror who now said because of the event that took place, I cannot be a good judge of the facts. How many do you want?" In response, the prosecutor expressed his inclination to bring criminal proceedings for contempt against Juror Tomeny. In light of the prosecutor's threat to bring criminal proceedings and the threat to Juror Tomeny's Fifth Amendment rights, the district court expressed concerns about questioning Juror Tomeny. Ultimately, the district court decided to permit the parties to question Juror Tomeny after questioning each juror.

Called separately, Jurors 2, 3, and 4 each acknowledged hearing Juror Tomeny's comments and participating in the subsequent argument, but maintained that they could follow the court's instructions. Juror No. 4, however, mentioned that a juror used a dictionary to look up the definition of "deliberate." Juror No. 5 stated that she used the dictionary to find the definition for "deliberate," made an enlarged photocopy of the definition, and then used the photocopy to inform other jurors "what we were supposed to be doing in order to reach a decision." Juror 5 adamantly denied that jurors used the dictionary to "look up anything else." After significant prompting, Juror 5 gave lukewarm assurances that she could be fair in reaching a verdict. The district court did not recall Jurors 1, 2, or 3 to question them about the dictionary.

After testifying that Juror Tomeny made her remarks in front of the entire jury, Juror No. 6 discussed the massive confusion and arguments which degenerated into "ill-mannered character assassinations between the jurors." Juror 6 further reported that she observed a newspaper on the jury table, but denied reading it and stated that she could still follow the court's instructions. The district court did not ask juror six about the dictionary.

Jurors 7, 9, 10, 11, and 12 each reported hearing Juror Tomeny's remarks about the maximum sentence and the subsequent arguments. Each acknowledged the presence of the dictionary in the jury room, but Juror 7 maintained that it was used only for "word games." Juror 9 contradicted this statement, however, admitting that the jury used the dictionary to define "predicate, subpredicate," and "[d]eliberation," among other words. Juror 9 further reported that prior to the beginning of deliberations, one of the alternate jurors regularly brought in a copy of *The Miami Herald,* but only read the sports section. Each of these jurors stated they could follow the court's instructions. The district court never questioned jurors 1, 3, 4, 5, 11, and 12 about the presence of a newspaper.

After questioning the jurors, the district court recalled Juror Wright and asked: "Can you fairly and impartially determine the facts in this case and have a full, fair discussion of the matter with your fellow jurors? I'm not trying to change your opinion. Tell me how you feel." Juror Wright responded with an emphatic "[n]o," and the district court dismissed her temporarily. During subsequent discussions with counsel, the district court received a note from Juror Wright, requesting an opportunity to explain why she could not be fair. The court promptly recalled Juror Wright, who stated: "From yesterday's experience, after the comment was made, if a vote did not go a certain way it was that we were prejudiced from the comment, and that is why I don't feel that I can make a fair—type of a fair discussion. There was no discussion to be made if you did not vote the way the majority did." After this explanation, Juror Wright stated that she could follow the law and render a fair verdict if all jurors had the opportunity to voice their opinions.

Upon considering the facts before it the district court concluded: "I have given very careful thought to the decision to be made, and I am convinced that justice requires that juror number eight and juror number one be discharged from any further consideration of this case." Thereafter, the district court directed counsel to research the issue of whether it could recall alternates. The next day, Thursday, March 21, Martinez filed a

motion for a mistrial, and the government filed a motion to substitute alternate jurors for Jurors Tomeny and Wright.

After reconvening, the court informed the parties that alternate Juror No. 6, Armando Coronel, had sent the district court a note asking to be excused and alleging violations of the court's orders after he was recalled for service. When called for questioning, Juror Coronel stated that in addition to regular discussions concerning Martinez's guilt prior to commencing deliberations, some jurors pressured other jurors, expressed opinions, and read the newspaper. Coronel admitted reading the newspaper himself, observing the newspaper in the jury room ten or twelve times during the course of the trial, and seeing the local section of *The Miami Herald* "wide open" on "top of the table" in the jury room. Furthermore, Juror Coronel specifically identified Jurors 10 and 2 as jurors who expressed their opinions that Martinez was guilty. Upon recall, Juror No. 10, Oscar ·Jubis, and Juror No. 2, foreperson Foust, denied Coronel's accusations, but admitted seeing the newspaper in the jury room.

Finally, the court called Juror Tomeny for questioning. First, the court asked Juror Tomeny whether any other jurors had expressed an opinion about Martinez's guilt. In response, Juror Tomeny said that other jurors made "little jokes" and that "some of these things that have been said about me the other jurors have done it as well." Juror Tomeny also stated that "everyone has seen themselves on the news." Juror Tomeny maintained that other jurors brought newspapers into the jury room, corroborating Juror Coronel's testimony, and that jurors discussed the merits of the case before deliberations began, thereby disobeying the district court's instructions.

Juror Tomeny also described the argument which ensued following her comments about Martinez's potential sentence in great detail. Specifically, she stated: "Some of the jurors tried to talk about anything; personal attacks, about weight. It was getting so vicious. It was completely out of hand. It was getting very hard—I was getting distressed, stomach distress over the whole thing." She stated that other jurors had

yelled at her and accused her of "hat[ing] the government" for voting not guilty. Furthermore, she reported that Juror Foust, the foreperson, told her how to vote and that other jurors attempted to "fabricate things" to get her removed from the jury.

When asked about her knowledge of Martinez's possible sentence, Juror Tomeny said that she heard the story in a store in a mall, not from the news media, but admitted to listening to news accounts of the trial the previous day. Expressing her apprehension concerning the media attention her conduct had brought on, Juror Tomeny stated:

> What is this about the HRS? This went on—this was—again it was on the news yesterday. I've been a foster mother for fifteen years. My personal life is laid out. I never had any problem, but these things made it to the news. How do you think I feel?

Juror Tomeny also stated that due to all the publicity, her husband began attending the court's proceedings the previous day, that friends who heard the news accounts about her called to tell her, and that she was questioned as she left the courthouse.

Upon concluding its questioning, the district court asked Tomeny if she could follow the law and render a fair and impartial verdict. Tomeny assured the court that she could. The court then recalled Juror Wright, who gave similar assurances. Based on these assurances, the court denied the government's motion to strike Jurors Tomeny and Wright and Martinez's motion for a mistrial. The district court then brought the entire jury panel into the courtroom and instructed it to set its feelings aside and directed the jury to retire for further deliberations. The jury continued its deliberations the following day, Friday, March 22, and returned a verdict the following Tuesday.

■ Martinez contends that the extrinsic evidence tainted the jury's deliberations, entitling him to a new trial. He argues that the district court's inquiry into the jury's deliberations demonstrates that the extrinsic evidence influenced Jurors Wright and Tomeny, and because both were leaning towards acquitting Martinez at the time the

extrinsic evidence was discovered, a reasonable possibility of prejudice exists requiring reversal. The government contends that Martinez has failed to show that the extrinsic evidence caused him prejudice.

■ As a matter of established law, the burden of proving prejudice does not lie with the defendant because prejudice is presumed the moment the defendant establishes that "extrinsic contact with the jury in fact occurred." *United States v. Caporale*, 806 F.2d 1487, 1503 (11th Cir.1986), *cert. denied*, 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987); *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir.1984). The lineage of this rule runs deep in Supreme Court jurisprudence: "Private communications, possibly prejudicial, between jurors and third persons ... are absolutely forbidden and invalidate the verdict at least unless their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892). More recently, the Court reaffirmed this rule with emphatic clarity:

> "In a criminal case, *any private communication [or] contact* ... directly or indirectly, with the juror during a trial about the matter pending before the jury *is, for obvious reasons, deemed presumptively prejudicial*, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties."

*Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (emphasis added).[3] *See also United States v. Spurlock*, 811 F.2d 1461, 1463 (11th Cir.1987) (adopting *Remmer* standard of presumptive prejudice).

■ Once the defendant proves extrinsic contact, the burden shifts to the government to demonstrate that the consideration of the evidence was harmless. *Perkins*, 748 F.2d at

1533; *Caporale*, 806 F.2d at 1503; *Spurlock*, 811 F.2d at 1463. Again, as the Court unambiguously held: "The presumption [of prejudice] is not conclusive, but the burden rests heavily upon the government to establish, after notice to the defendant, that such contact with the juror was harmless to the defendant." *Remmer*, 347 U.S. at 229, 74 S.Ct. at 451.

In this case, Martinez met his initial burden of showing that extrinsic evidence invaded the jury's deliberations. He showed that during the course of this highly publicized trial: (1) Juror Tomeny informed the other jurors that Martinez faced 160 years of imprisonment if convicted; (2) the jury used a dictionary to define terms arising during deliberations, including words with technical meanings; (3) the jurors watched news accounts on television; (4) Juror Tomeny became aware of the publicity surrounding her participation on the jury; and (5) jurors regularly brought newspapers reporting trial events into the jury room.

■ Because Martinez demonstrated that extrinsic evidence entered the jury's deliberations, we assume prejudice and thus, we must consider whether the government rebutted that presumption. *Perkins*, 748 F.2d at 1534. In doing so we consider many factors including the heavy burden on the government, the nature of the extrinsic information, the manner in which the information reached the jury, and the strength of the government's case. *United States v. Rowe*, 906 F.2d 654, 657 (11th Cir.1990); *Remmer*, 347 U.S. at 229, 74 S.Ct. at 451.

The government first argues that no evidence exists which shows that the jurors considered extrinsic materials that were relevant to the issues before them. This argument ignores the basic fact that it was Juror Tomeny's remarks concerning Martinez's potential sentence and her perceived refusal to

---

**3.** Relying upon *United States v. Rowe*, 906 F.2d 654, 656 (11th Cir.1990), the government argues that the defendant does not benefit from a presumption of prejudice after showing extrinsic contact with the jury, but bears a higher initial burden of proving prejudice through a preponderance of the credible evidence. Although we recognize the apparent conflict between the standard pronounced in *Rowe* and the unambiguous mandate of *Remmer*, we need not resolve that

issue, because even applying the more rigorous standard, our conclusion remains the same. See *Kitowski v. United States*, 931 F.2d 1526, 1529 (11th Cir.1991), cert. denied, — U.S. ——, 112 S.Ct. 371, 116 L.Ed.2d 323 (1991) (Circuit Court may not overrule Supreme Court precedent). As discussed below, Martinez has shown prejudice through the presentation of a preponderance of the credible evidence.

deliberate, which led Juror Foust to report her actions in the first place. According to Foust, Juror Tomeny adamantly stated that it was unfair to convict Martinez when all the other participants received plea bargains. This shows not only that Juror Tomeny considered the extrinsic evidence, but that it impacted upon her decision-making.

Juror Wright, likewise, expressed a belief that she could not be impartial due to Tomeny's statements and the controversy that ensued. In addition to Tomeny and Wright, alternate Juror Coronel expressed misgivings over the deliberations and specifically requested to be excused. When called to the stand he reported that in addition to the jury's regular discussions concerning Martinez's guilt, some jurors pressured others to change their positions.

In addition to the testimonial evidence showing that jurors considered extrinsic materials, indirect evidence suggests that the jury considered other extrinsic materials as well, thereby contravening the district court's instructions. Several jurors testified that newspapers frequently appeared in the jury room and jurors read them. In fact, alternate Juror Coronel admitted to reading the newspaper himself. Jurors Tomeny and Coronel revealed that all of the jurors disregarded the district court's instructions and watched themselves on television. Likewise, despite all the events which transpired, including the district court's admonishments, Juror Tomeny again ignored the court's instructions and discovered, directly or indirectly through media, that she had become the focus of an investigation. Based on these revelations, Tomeny's husband began attending the proceedings. Obviously, he did not attend the proceedings without discussing the events with his wife.

Finally, the jury also used a dictionary to define several words, some with technical meanings, during its deliberations. Although some jurors testified that the jury used the dictionary to define only one word, others stated that they used it frequently. Standing alone, the jury's use of the dictionary would not warrant a new trial, but in light of the circumstances, including the jury's willingness to disregard the district court's instructions, the jury's use of the dictionary further taints its deliberations.

The government contends that each juror assured the court that it could follow the court's instructions and deliberate in a fair and impartial manner. In this case, such assurances are unavailing because at least two jurors expressed serious reservations about their ability to deliberate in a fair and impartial manner, and the majority of the jury demonstrated an inability to follow the district court's instructions. Although we assume that jurors follow the trial court's instructions, in instances such as this, where jurors demonstrate a willingness to disregard the court's instructions, we are justifiably skeptical of the jurors' ability to follow instructions in the future. *See United States v. Heller*, 785 F.2d 1524, 1526–28 (11th Cir. 1986) (reversal of defendant's tax conviction warranted where juror questioned unknown accountant and shared conversation with other jurors, despite jurors' individual promises that they could disregard extraneous matters).

The government argues that any prejudice arising from Juror Tomeny's remarks prejudiced the government's case and was beneficial to Martinez. While at first blush Tomeny's comments may appear beneficial to Martinez, the events transpiring after those comments demonstrate a reasonable probability that the effect was actually prejudicial to Martinez. *Rowe*, 906 F.2d at 656. Initially, Jurors Wright and Tomeny were predisposed to acquit Martinez. After other jurors revealed that Juror Tomeny commented on Martinez's potential sentence, her conduct became the focal point of the district court's inquiry. The disclosures and subsequent court investigation led to a flood of media exposure. According to her own statements, this exposure effected Juror Tomeny, as she felt her personal life now was the subject of public discussion. With her personal life splashed across the news media, Juror Tomeny's husband began attending the court proceedings, and friends began calling to express concern.

Moreover, the court's inquiry revealed that during the jury's deliberations following the remarks, other jurors subjected Juror Tome-

ny to a vicious attack on her character, including references to her weight and repeated accusations that she "hated" the government. Due to the heated arguments and the personal attacks, Juror Tomeny was so distressed that she became physically ill.

As the facts and circumstances suggest, an atmosphere of coercion prevailed during the jury's deliberations and the district court's investigation. Then, when considered in light of the prosecutor's threat to initiate contempt proceedings against Juror Tomeny, these circumstances demonstrate that a reasonable probability exists that Tomeny was coerced to alter her vote. Likewise, Juror Wright's expressed inability to deliberate fairly, when considered in conjunction with the prevailing coercive conditions, shows a reasonable possibility that the extrinsic evidence and the means employed to unearth it affected her vote as well.

Because the government's evidence was not overwhelming, we conclude that a reasonable probability exists that extrinsic matters influenced the jury's deliberations, and that the district court abused its discretion when it denied Martinez's motion for a mistrial. *Rowe*, 906 F.2d at 657. We therefore, reverse his convictions and remand for a new trial. Although the jury's improper consideration of extrinsic materials provides a sufficient basis for reversing Martinez's convictions, we address one further issue for clarification in the event of a new trial.

### B. Jury Instructions

Counts III–VIII of the superseding indictment charged Martinez with extortion under the Hobbs Act, 18 U.S.C. § 1951. The Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). At the close of evidence the district court instructed the jury on extortion as follows:

> Extortion means to obtain property from someone else with his consent, but whose consent is brought about or induced by the wrongful use of actual or threatened force, violence or fear.

> Extortion also includes the wrongful acquisition of property from someone else under color of official right.

> . . . .

> Extortion under color of official right is the wrongful taking by a public official of money or property not due to him or his office, whether or not the taking was accomplished by force, threats or use of fear.

> In other words, the wrongful use of otherwise valid official power, may convert lawful action into extortion.

> So, if a public official threatens or agrees to take or withhold official action for the wrongful purpose of inducing a victim to part with property, such action would constitute extortion even though the official was already duty bound to take or withhold the action in question.

> Acceptance by an elected official of economic benefits does not in itself constitute a violation of federal law, even though the giver of the benefit has business pending before the official.

> However passive acceptance of a benefit by a public official is sufficient to form the basis of an extortion violation, if the official knows he had been offered the payment in exchange for the exercise of his official power, or that such payment is motivated by hope of influence.

Martinez contends that the district court's instructions were legally insufficient because they failed to accurately distinguish between legal and illegal conduct for public officials. He argues that under the Supreme Court's recent decisions in *McCormick v. United States*, 500 U.S. 257, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991) and *Evans v. United States*, —— U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992), the government must prove the existence of an explicit promise (a *quid pro quo*), in order to obtain a conviction under the Hobbs Act. Because the court's instruction contained no *quid pro quo* requirement, Martinez argues that his convictions must be reversed. In responding, the government argues that *Evans* does not require the government to prove a *quid pro quo*, and that the court's instructions were legally sufficient. To resolve this dispute we review both *McCormick* and *Evans*.

In *McCormick,* a state legislator appealed his extortion conviction, based upon his acceptance of contributions in exchange for his support on particular legislation. The trial court instructed the jury that the government was not required to prove a *quid pro quo.* The Court reversed his conviction, holding: "The receipt of such contributions is . . . vulnerable under the Act as having been taken under color of official right, *but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."* *McCormick,* 500 U.S. at ——, 111 S.Ct. at 1816, 114 L.Ed.2d at 326 (emphasis added). A contrary conclusion, the Court reasoned, would have the effect of criminalizing conduct traditionally within the law and unavoidable under this country's present system of elected politics. *McCormick,* 500 U.S. at —— – ——, 111 S.Ct. at 1816, 114 L.Ed.2d at 325–26. However, the Court explicitly limited its holding to the context of campaign contributions. *McCormick,* 500 U.S. at —— – ——, —— n. 10, 111 S.Ct. at 1815–16, 1817 n. 10, 114 L.Ed.2d at 324–26, 326 n. 10.

After *McCormick,* the Court issued *Evans,* where it considered whether a *quid pro quo* was required outside the context of campaign contributions. In deciding this question, the Court stated that "an affirmative act of inducement by a public official, such as a demand, is [not] an element of the offense of extortion 'under color of official right.'" *Evans,* —— U.S. at —— – ——, 112 S.Ct. at 1884, 119 L.Ed.2d at 66–67. The Court held, however, that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made *in return for official acts."* *Evans,* —— U.S. at ——, 112 S.Ct. at 1889, 119 L.Ed.2d at 72 (emphasis added). Then, rejecting the appellant's criticism of the specific instruction, the Court concluded that the instruction satisfied "the *quid pro quo* requirement of *McCormick,* because the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts[.]" *Evans,* —— U.S. at ——, 112 S.Ct. at 1889, 119 L.Ed.2d at 72.

■ We construe this language from *Evans* as adopting the *quid pro quo* requirement of *McCormick,* and conclude that the district court's failure to give an instruction embodying that requirement constitutes reversible error in this case.[4] The district court refused to instruct the jury on the *quid pro quo* requirement under *McCormick,* because it believed that requirement was limited to instances of extortion under color of official right involving campaign contributions. Because *Evans* modified this standard for non-campaign contribution cases in requiring the government to prove "that a public official has obtained a payment to which he is not entitled, knowing the payment was made in return for official acts," the district court's failure to instruct the jury accordingly, was error. *Evans,* —— U.S. at ——, 112 S.Ct. at 1889, 119 L.Ed.2d at 72.[5]

■ The government concedes that the district court failed to instruct the jury on the *quid pro quo* requirement. It argues, however, that if such an omission was error, we may still affirm Martinez's conviction because the indictment also charged Martinez with committing extortion "induced by wrongful fear of economic loss, which does not implicate the *quid pro quo* requirement." We reject this argument because, as Martinez points out, an alternative theory on which to base a conviction does not save the legal defect in the instruction. *See United States v. Garcia,* 992 F.2d 409, 416 (2nd Cir.1993) (conviction reversed where legal

---

4. At least two other circuit courts have reached a similar conclusion. See *United States v. Garcia,* 992 F.2d 409 (2nd Cir.1993) and *United States v. Taylor,* 993 F.2d 382 (4th Cir.), cert. denied, —— U.S. ——, 114 S.Ct. 249, 126 L.Ed.2d 202 (1993).

5. Because the substance of the subpredicate acts involving bribery under Florida law is essentially the same as extortion under the Hobbs Act, this analysis applies equally to the district court's jury instructions as to those charges in Counts I and

II. *United States v. O'Keefe,* 825 F.2d 314, 320 (11th Cir.1987); *Shields v. Smith,* 404 So.2d 1106, 1110–11 (Fla. 1st DCA 1981); *see State v. Gerren,* 604 So.2d 515 (Fla.App. 4 Dist.1992) (state must show a *quid pro quo* for state law crime of unlawful compensation). Thus, because the jury instructions concerning the state law crimes failed to instruct on quid pro quo, they must also be reversed. *Gerren,* 604 So.2d at 516, 520.

**554**

defect exists in extortion instructions even though valid theory exists to support conviction); and *United States v. Heller*, 830 F.2d 150, 155–56 (11th Cir.1987) (conviction reversed where one of two theories is defective, even though evidence exists to support guilt under non-defective government theory). Thus, even if an alternative theory existed to support Martinez's conviction, the legal defect in the jury instruction requires reversal.

### CONCLUSION

We conclude that a reasonable possibility exists that the jury's use of extrinsic evidence during its deliberations, and the circumstances surrounding the district court's inquiry into that misconduct, caused Martinez prejudice. We also conclude that the district court's instructions on extortion under the Hobbs Act failed to properly inform the jury that the government must prove the existence of a *quid pro quo* in order for the jury to find Martinez guilty. For these reasons, we reverse Martinez's convictions and remand for a new trial.

**REVERSED and REMANDED.**