UNITED STATES of America, Plaintiff-Appellee,

v.

Jubal Charles REGISTER, Ronald Owen Bilbrey, Jr., and Herbert Charles Register, Defendants-Appellants.

No. 96-2599.

United States Court of Appeals,

Eleventh Circuit.

July 29, 1999.

Appeals from the United States District Court for the Middle District of Florida. (No. 93-305-CR-T-17A), Lee P. Gagliardi, Judge.

Before MARCUS, Circuit Judge, and KRAVITCH, Senior Circuit Judge.[*]

KRAVITCH, Senior Circuit Judge:

A jury convicted defendants-appellants Herbert Charles Register ("Charles Register"), Jubal Charles Register ("Jubal Register"), and Ronald Owen Bilbrey, Jr. ("Bilbrey") in November 1995 of various federal crimes related to drug trafficking, including one count of conspiring to distribute and to possess for the purpose of distributing methamphetamine in violation of 21 U.S.C. § 846 and multiple counts of possession with intent to distribute and distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The jury also convicted Bilbrey and Charles Register of other drug offenses; Charles Register of two counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g); and Jubal Register of carrying a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c).[1] Finally, the jury required the defendants to forfeit two businesses and two parcels of real estate pursuant to 21 U.S.C. § 853(a). The district court set aside the jury's verdict against Jubal Register for using a firearm

[*]This decision is rendered by a quorum, due to the retirement of then-Chief Judge Hatchett on May 14, 1999. *See* 28 U.S.C. § 46(d).

[1]The jury found the defendants not guilty on several other counts charged in the superseding indictment.

in relation to drug trafficking, sentenced all three defendants on their convictions, and entered an order requiring the defendants to forfeit the property in question.

Each defendant appeals several aspects of his trial, conviction, and/or sentence. The defendants present a total of seven issues for our consideration: (1) whether the amount of time that passed between the initial indictment and the trial violated Jubal Register's statutory or constitutional right to a speedy trial; (2) whether the district court violated Charles Register's constitutional right to be represented by counsel of his choice by disqualifying his retained attorney prior to trial; (3) whether the district court erred in refusing to grant Charles Register an adversarial, pre-trial hearing with respect to the government's filing of notices of lis pendens regarding his property, effectively preventing him from using that property to retain a new attorney; (4) whether the district court erred when it retained one juror accused of bias and when it dismissed and replaced another juror for improper conduct; (5) whether sufficient evidence existed to support Jubal Register's convictions; (6) whether the district court erred in enhancing Charles Register's and Jubal Register's sentences for possession of a firearm during the commission of a drug offense; and (7) whether the district court violated the Ex Post Facto clause by applying the most recent version of the Sentencing Guidelines.

With respect to the last three issues, we have examined the record and found those challenges to be without merit; we therefore affirm the district court's decisions on those three points without discussion. We also affirm the district court with respect to the first four issues, for the reasons discussed in Part II of this opinion.

## I. Background

A grand jury originally returned an indictment encompassing some of the charges in this case in 1992 ("the initial indictment" or "the 1992 indictment"). As a result, Charles Register and Jubal Register both were arrested. At their arraignment in October 1992, the government brought to the court's attention a possible conflict of interest: Charles Register's attorney previously had represented several potential witnesses and currently was representing Jubal Register on matters related to the charges in the indictment. The court held

a *Garcia*[2] hearing, explaining to Charles Register how his attorney's other representations could impair his ability to represent Charles Register effectively. Charles Register waived any conflict of interest, electing to proceed with his attorney, and the court accepted this waiver. The court detained Charles Register; Jubal Register initially obtained bond but violated conditions of his bond release in May 1993, which resulted on his detention. Both Charles Register and Jubal Register remained in prison until their trial in November 1995.

In November 1993, a grand jury returned another indictment ("the 1993 indictment") that included additional defendants[3] and charges; shortly thereafter, the government dismissed the initial indictment. The 1993 indictment charged, among other things, that the defendants had formed an "enterprise" to provide an organized framework for distributing controlled substances in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. It alleged that one manner in which the enterprise operated was that unnamed "attorneys" representing members of the enterprise would learn of the forthcoming execution of search warrants, warn enterprise members of the warrants, and conceal contraband for the members to avoid detection, and would share other information they obtained from their clients with other members of the enterprise. The 1993 indictment also set out the charges on which the jury ultimately convicted the defendants and included forfeiture allegations with respect to personal property, businesses, and real estate parcels. Immediately after the grand jury returned this indictment, the government filed lis pendens notices with respect to three pieces of real estate on which it was seeking forfeiture. Charles Register had an ownership interest in two of these pieces of property.[4]

In January 1994, the government again moved for the district court to disqualify Charles Register's retained attorney because of an actual or potential conflict of interest. This time the government argued that (1) in the past the attorney had represented some of Charles Register's codefendants in state court on

---

[2]*See United States v. Garcia,* 517 F.2d 272 (5th Cir.1975).

[3]The 1993 indictment (and the superseding indictment) originally charged five defendants. On the day the trial began, one of them pleaded guilty, and the government dismissed the indictment as to another.

[4]Although Charles Register apparently did not have legal title to either piece of property and the exact nature of his interest is unclear, all parties agree that he had some ownership interest in each of them.

substantially related matters; (2) the attorney currently was representing Jubal Register in a related state court matter; and (3) the attorney was a subject, though not a target, of the ongoing grand jury investigation into the criminal activity covered by the indictment, and the government possessed information implicating him in the defendants' alleged criminal conduct. The court ordered a full-scale, adversarial *Garcia* hearing to resolve the conflict of interest issue.[5]

The court held the second *Garcia* hearing over three days in December 1994. The government called five witnesses who testified about four possible incidents of misconduct by the attorney. Counsel representing Charles Register's attorney cross-examined the government's witnesses and called two government agents to the stand. At the conclusion of the testimony, the government and the attorney's counsel presented arguments regarding whether the evidence presented at the hearing would be admissible at trial, whether the evidence could be redacted in a way to avoid implicating Charles Register's attorney, and whether the evidence demonstrated an actual or potential conflict of interest such that the court should disqualify the attorney. In January 1995, the district court issued its ruling that an actual conflict of interest existed because the attorney might be more strongly motivated to protect his own interests than those of his client, Charles Register. Although the court did not issue any conclusive findings with respect to the truthfulness of the allegations against the attorney, it found a reasonable possibility that the allegations were true based upon the credible testimony of the government's witnesses. On this basis, it refused to accept Charles Register's waiver of the conflict of interest and disqualified his attorney.

In March 1995, the grand jury handed down its third indictment related to these defendants ("the superseding indictment"), which replaced the 1993 indictment. The superseding indictment was substantially similar to the 1993 indictment except that it eliminated all RICO charges, including all references to any participation by the defendants' unnamed "attorneys" in their criminal activities.

---

[5]The court determined that a new *Garcia* hearing was necessary because the government's new allegations—that the attorney could have a conflict based upon his possible involvement in the defendants' criminal activity and the grand jury's investigation of his actions—were not before the court at the first *Garcia* hearing.

Meanwhile, Charles Register had begun trying to find a new attorney. Although he located an attorney whom he wanted to hire, Richard Hersch, Charles Register's only assets were the two properties with respect to which the government had filed notices of lis pendens in anticipation of requiring their forfeiture. He contended that because the lis pendens notices effectively prevented him from using those assets to retain counsel, the government violated his rights to due process and to be represented by an attorney of his choice by filing the notices without providing him with an adversarial, pre-trial hearing. Hersch entered a limited appearance on behalf of Charles Register on this issue only, demanding a pre-trial hearing with respect to the government's restraint of the property. In the meantime, however, the court found Charles Register to be indigent and appointed an attorney to represent him. Charles Register quickly became unhappy with his appointed attorney and petitioned the court at various times to appoint a new attorney or to allow him to represent himself. A magistrate judge held a hearing to address Charles Register's representation in July 1995. After the magistrate judge determined that it needed to appoint a new attorney, it replaced Charles Register's appointed counsel in August 1995 with attorney Frank Louderback.[6]

The court referred the motion for a hearing on the lis pendens notices to a magistrate judge who began trying to resolve the issue but ultimately determined that he should recuse himself. The second magistrate judge to address the issue recommended in September 1995 that Charles Register was not entitled to any hearing regarding the reasonableness of the lis pendens notices. The magistrate judge reasoned that such a hearing was not required to satisfy either Charles Register's Sixth Amendment right to counsel (because the court had appointed an attorney to represent him) or the Fifth Amendment due process clause (because the lis pendens filings did not themselves amount to a deprivation of property—they merely notified the public that the government was pursuing forfeiture of the property). The district court adopted this ruling, and Charles Register proceeded to trial represented by appointed attorney Louderback.

---

[6]During the same time period, Jubal Register also was expressing displeasure with his appointed attorney and demanding that the court allow him to proceed pro se. In August 1995, however, Jubal Register and his appointed attorney apparently resolved their differences, and Jubal Register rescinded his motion for the court to require his attorney to withdraw.

The trial took place in November 1995 and lasted ten days. On the morning of the first full day of jury deliberations, the government raised a concern about Juror Number 6. After conducting a limited investigation, the judge dismissed the juror over the defendants' objections, replacing her with the first alternate. The newly impaneled jury deliberated for nearly two days before returning the verdict described above. The court subsequently conducted the forfeiture phase of the trial, and the jury reached a verdict in favor of the government with respect to all of the property on which the government sought forfeiture. At sentencing, the court adopted the factual findings and Sentencing Guidelines applications recommended in the presentence investigation reports for all three defendants except that as to defendants Charles Register and Jubal Register, the court declined to apply an enhancement for obstruction of justice. The court sentenced Bilbrey to 360 months of imprisonment and 60 months of supervised release, and Charles Register and Jubal Register each to 222 months of imprisonment and 60 months of supervised release. This appeal followed.

## II. Discussion

A.      Speedy Trial

Jubal Register contends that the 38-month delay between his arrest under the initial indictment and his trial violated his rights to a speedy trial provided by the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. §§ 3161-3174. We examine the question whether the district court violated Jubal Register's legal rights *de novo. See Whitley v. United States,* 170 F.3d 1061, 1068 n. 14 (11th Cir.1999).

The Supreme Court has identified four factors that courts should consider in determining whether a defendant has been deprived of his constitutional right to a speedy trial: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of the right; and (4) the prejudice to the defendant. *See Barker v. Wingo,* 407 U.S. 514, 530-32, 92 S.Ct. 2182, 2192-93, 33 L.Ed.2d 101 (1972). The first factor serves a triggering function; unless some "presumptively prejudicial" period of delay occurred, we need not conduct the remainder of the analysis. *See id.* at 530, 92 S.Ct. at 2192. The government concedes, however, that the 38-month delay in this case was presumptively prejudicial. *See Doggett v. United States,* 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 2691 n. 1, 120 L.Ed.2d 520 (1992) ("[T]he lower courts have generally found

post accusation delay 'presumptively prejudicial' at least as it approaches one year."); *see also United States v. Schlei,* 122 F.3d 944, 987 (11th Cir.1997) (recognizing that the Eleventh Circuit is in accord with *Doggett* 's observation), *cert. denied,* --- U.S. ----, 118 S.Ct. 1523, 140 L.Ed.2d 674 (1998). Despite this significant passage of time, we conclude upon examination of the other three factors that the delay did not violate Jubal Register's constitutional rights.

Beginning with the fourth factor, we note that Jubal Register has failed to put forth a single argument that the delay in his trial resulted in any actual prejudice to him. In fact, he apparently concedes that he suffered no prejudice and furthermore recognizes that "[i]n this circuit, a defendant generally must show actual prejudice unless the first three factors ... all weigh heavily against the government." *United States v. Davenport,* 935 F.2d 1223, 1239 (11th Cir.1991). Jubal Register nonetheless contends that this court should find a violation of his Sixth Amendment right by holding that the length of the delay, the reason for the delay, and his assertion of his right all weigh strongly in his favor.

Although we agree that 38 months is an extraordinary period of time to force a defendant to wait for a trial and that, under many circumstances, a delay of that length would amount to a constitutional violation, in this case, the second and third factors do not support a holding in Jubal Register's favor. After studying the record, we cannot attribute the delay entirely to the government. Instead, our analysis leads us to conclude that Jubal Register, his codefendants, and the government all bear some responsibility for putting off the trial; the complex nature of the charges and sheer number of defendants and issues involved also account for some of the delay. As explained in Part I, *supra,* the district court spent a significant amount of time addressing the government's motion to disqualify Charles Register's attorney and Charles Register's motion for a pre-trial hearing on the lis pendens notices. The court also dealt with issues that Jubal Register presented to it, including requests to allow him to proceed pro se and multiple motions to reconsider its decision to detain him after he violated the conditions of his original bond release. Jubal Register's attorney

also moved for continuances on more than one occasion; the record reflects that he filed the last such motion, which the court denied, only five days before the trial commenced.[7]

Finally, the record belies Jubal Register's contention that he aggressively sought to exercise his right to a speedy trial. He claims that he attempted to enforce his right on four occasions between April 1994 and September 1995, but in fact he demanded a speedy trial in only two of those motions; the other two requested that he be released due to excessive pre-trial detention. Furthermore, the record shows that on at least four occasions between May 1994 and October 1995 (including the above-noted instance five days before the trial actually began), Jubal Register, through counsel, moved for a continuance. In light of these facts, we cannot say that the second and third factors "weigh heavily against the government," *Davenport,* 935 F.2d at 1239, and we therefore find no violation of Jubal Register's Sixth Amendment right to a speedy trial.

We also reject Jubal Register's argument that he is entitled to relief under the Speedy Trial Act, which generally requires the trial of a criminal defendant to commence within 70 days of the later of the date the indictment was filed or the date the defendant made his first appearance before the court. *See* 18 U.S.C. § 3161(c)(1). The sanction that the statute provides in case of its violation is dismissal of the indictment, either with or without prejudice. *See* 18 U.S.C. § 3162(a)(2). The defendant must request this relief, however, and "[f]ailure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section." *Id.; see also United States v. Tenorio-Angel,* 756 F.2d 1505, 1508 (11th Cir.1985) (refusing to grant defendant relief for Speedy Trial Act violation because defendant failed to move for dismissal of the indictment). Although Jubal Register on more than one occasion demanded a speedy trial and moved for release from prison based upon excessive pre-trial detention, the record reveals that he never moved the court to dismiss the indictment, nor has he

---

[7]The district court also faced extensive pre-trial litigation between a local newspaper that attempted to intervene in the case to gain access to the records pertaining to the attorney's disqualification, which had been sealed, and Charles Register and his retained attorney, who vehemently opposed the release of those records. A codefendant's interlocutory appeal also may have affected the trial date.

represented on appeal that he ever made such a request. He therefore has waived any right he may have had to the statutory remedy.[8]

B.       Disqualification of Counsel

Charles Register contends that the district erred by disqualifying his attorney for two reasons. First, he argues that the evidence of the attorney's wrongdoing was too tenuous to override his Sixth Amendment right to be represented by counsel of his choice. Second, he claims that the circumstances surrounding the disqualification suggest that the government acted in bad faith to manufacture the conflict specifically for the purpose of depriving him of this Sixth Amendment right. We review a district court's decision to disqualify a defendant's attorney due to a conflict of interest for abuse of discretion. *See Wheat v. United States,* 486 U.S. 153, 163, 164, 108 S.Ct. 1692, 1699, 1700, 100 L.Ed.2d 140 (1988); *United States v. Ross,* 33 F.3d 1507, 1522 (11th Cir.1994).

The crux of Charles Register's argument is that the law requires direct evidence of an actual conflict of interest before disqualification of a criminal defendant's attorney of choice is justified and that the government did not produce any such evidence in this case. He relies primarily on two circuit court cases—*United States v. Hobson,* 672 F.2d 825 (11th Cir.1982) (per curiam) and *United States v. Fulton,* 5 F.3d 605 (2d Cir.1993)—to support this formulation of the law. Neither *Hobson* nor *Fulton* sets out the rule that Charles Register infers from them. *Hobson* affirmed the disqualification of the defendant's attorney where the government presented an affidavit of a witness expected to testify at trial who claimed that he and the attorney had discussed the attorney's assisting the witness in performing criminal activity related to the drug conspiracy for which the government was prosecuting the defendant. *See Hobson,* 672 F.2d at 826. *Fulton* reversed a district court's acceptance of a defendant's waiver of his attorney's conflict of interest when

---

[8]Aside from Jubal Register's waiver of the remedy, we doubt that any violation of the Speedy Trial Act occurred. Despite the general 70-day deadline for the commencement of trials, the statute provides for a number of periods of excludable delay, including time "resulting from any pretrial motion," 18 U.S.C. § 3161(h)(1)(F);  reasonable time "when the defendant is joined for trial with a codefendant as to whom the time for trial has not run," *id.* § 3161(h)(7);  and delay resulting from a continuance if the judge finds "that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial," *id.* § 3161(h)(8)(A). The record shows that large portions of the 38-month delay in this case were attributable to each of these reasons. *See generally supra* pages 3435-36.

a witness, after the trial commenced, stated that he would testify that the attorney had received a portion of the drug shipment that the witness had smuggled into the United States. *See Fulton,* 5 F.3d at 607-08. Thus, both *Hobson* and *Fulton* address situations in which direct evidence existed of the attorney's conflict of interest with his client, but neither limits its holding to those circumstances. While attempting to construe these two cases to stand for an extremely narrow formulation of the law allowing disqualification of counsel, Charles Register ignores the Supreme Court's most recent teachings on this issue.

In *Wheat,* the Court granted certiorari to resolve a "substantial disagreement" among the Courts of Appeals "about when a district court may override a defendant's waiver of his attorney's conflict of interest." 486 U.S. at 158, 108 S.Ct. at 1696. *Wheat* recognized significant limits on a defendant's right to be represented by counsel of his choice. Conceding that "the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment," the Court held that the more important protection that the Amendment affords is the assurance of a fair trial: "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* at 159, 108 S.Ct. at 1697. In addition to the defendant's own Sixth Amendment interest in effective representation, the Court pointed out that federal courts' "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them" may circumscribe the right to counsel of choice. *Id.* at 160, 108 S.Ct. at 1698. Thus, the Court directed:

> The District Court must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a *showing of a serious potential for conflict.* The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

*Id.* at 164, 108 S.Ct. at 1700 (emphasis added).

The Court in *Wheat* did not confine its allowance of disqualification to situations involving direct evidence of a conflict of interest. Although it did not specifically address the nature of the evidence sufficient to support disqualification, it did point out that district courts often must make a decision on this issue before all of the relevant information has crystalized:

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict.... It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand.

*Id.* at 162-63, 108 S.Ct. at 1699. This language simply does not comport with a rule that the government must present direct evidence of a conflict before the district court is authorized to disqualify a defendant's chosen attorney.

Moreover, it is a common tenet of modern American jurisprudence that indirect evidence (often called "circumstantial" evidence) is not intrinsically less valuable or less reliable than direct evidence. *See generally United States v. Henderson,* 693 F.2d 1028, 1030 (11th Cir.1982) ("Circumstantial evidence can be and frequently is more than sufficient to establish guilt beyond a reasonable doubt. The test for evaluating circumstantial evidence is the same as in evaluating direct evidence."); *United States v. Sureff,* 15 F.3d 225, 229 (2d Cir.1994) ("Circumstantial evidence is ... not a disfavored form of proof."). That the Federal Rules of Evidence do not mention direct versus indirect evidence underscores the lack of a clear legal distinction between the two. *See* 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5162, at 16 (1978) (describing frequent "over-simplification" of distinction between direct and circumstantial evidence); *id.* § 5163, at 37 (declining to discuss definitions of various forms of evidence, including "direct" and "circumstantial," because "[m]ost of these sub-species are not recognized in the rules of admission and exclusion" and "none of these terms are used in the Evidence Rules"). Considering these acknowledgments of the potential significance of indirect evidence and in light of the Supreme Court's recognition of the need for the district court prior to trial to evaluate the "murky" issue of a defendant's attempted waiver of his attorney's conflict of interest, we conclude that the law does not require direct evidence to support the court's refusal to accept that waiver.

Turning to the facts of this case, the record shows that, as our precedent requires, the district court held a full-scale, adversarial hearing in order to evaluate the government's evidence regarding the attorney's

alleged involvement in the defendants' illegal activities and Charles Register's attempted waiver of any conflict of interest.[9] *See United States v. Garcia,* 517 F.2d 272, 278 (5th Cir.1975) (requiring hearing to determine whether defendants competently waive right to conflict-free counsel); *In re Paradyne Corp.,* 803 F.2d 604 (11th Cir.1986) (granting petition for writ of mandamus to prevent district court from considering government's motion to disqualify in ex parte, in camera proceeding). In this hearing, the government called five witnesses who presented evidence regarding four separate incidents illustrating the attorney's possible involvement in the defendants' drug-related activities.[10]

The most damaging evidence was the testimony of a part-time confidential informant who had had a number of conversations with Charles Register about drugs. In particular, the informant testified about one conversation in which Charles Register admitted having paid part of his attorney's fees with methamphetamine.[11] When subjected to extensive cross-examination on the subject, the informant reiterated his prior testimony and rejected the suggestion that he might have misunderstood Charles Register's comments. He insisted that it was not possible that Charles Register meant only that he had paid his attorney with money earned from drugs.[12]

---

[9]Initially, the district court referred this matter to a magistrate judge in March 1994. Because the government did not want to disclose to the attorney its information regarding his possible involvement with the criminal activity, the magistrate judge complied with its request to conduct an ex parte, in camera hearing, appointing independent counsel to defend the interests of the attorney and Charles Register, who still wanted the attorney to represent him. Based upon the government's evidence presented at the hearing, the magistrate judge ordered the attorney disqualified in June 1994. Charles Register moved the district court for reconsideration, and the court in October 1994 vacated the magistrate judge's order, concluding that the ex parte, in camera hearing was insufficient to protect Charles Register's Sixth Amendment right to counsel of his choice. The district court thereafter conducted the full-scale hearing discussed in the text, *infra.*

[10]Because the record of this *Garcia* hearing is sealed to protect the attorney in question, we refrain from quoting from the transcript of the hearing. We have reviewed that transcript carefully, and we summarize the evidence presented at the hearing, omitting the names of the witnesses and the participants (other than the defendants in this case) in the events they described.

[11]*Garcia* Hearing Tr., R27 at 308-09.

[12]*Id.* at 342.

The government elicited other evidence of more questionable admissibility in the course of the *Garcia* hearing. First, two witnesses testified regarding an alleged plot between a codefendant (who was dismissed on the eve of trial) and the attorney to submit a false affidavit in order to obtain the return of seized money. One of these witnesses claimed to have participated in the plan; the other stated that he had witnessed the planning and a portion of the scheme's implementation. Second, one witness stated that after he approached the attorney for legal advice concerning state law enforcement officials' disclosure to him of their suspicions of his drug activities, Bilbrey told the witness that the attorney had told Bilbrey of the officials' inquiry. Finally, another witness provided testimony suggesting that the attorney may have stored a gun at his office that belonged to Charles Register, a convicted felon.

At the conclusion of the witnesses' testimony, the district judge discussed in detail with both parties the issues of the admissibility of the testimony at trial and the standards that he needed to apply to determine whether he should disqualify the attorney.[13] In its order, the district court specifically found that the informant's testimony regarding Charles Register's statement that he paid his attorney's fees partly in methamphetamine would be admissible at trial under Federal Rule of Evidence 801(d), which provides that a party's own admissions are admissible as non-hearsay evidence if offered against him.[14] The district court concluded that this evidence "alone [was] sufficient" to disqualify the attorney based upon a conflict of interest.[15] Although the district court found the other government witnesses to be credible and stated that "the other alleged acts further link [the attorney] to the criminal organization," the district court did not rule on the potential admissibility at trial of evidence of any of the other alleged incidents.[16]

---

[13]*See Garcia* Hearing Tr., R28 at 395-419; R29 at 45-75.

[14]Dist. Ct. Order Granting Gov't Mot. to Disqualify, R12-150 at 9. *See* Fed.R.Evid. 801(d) ("A statement is not hearsay if ... (2) ... [t]he statement is offered against a party and is (A) the party's own statement....").

[15]Dist. Ct. Order, R12-150 at 9.

[16]*Id.* at 9.

The district court's ruling with respect to the informant's testimony was correct: Charles Register's alleged statements tended to show by his own admission that he distributed methamphetamine, one of the crimes the indictment charged him with committing. The admissibility of evidence of the other alleged wrongful acts was less clear, even assessing that evidence, as the district court was required to do, without the benefit of the hindsight we enjoy. Despite the tenuousness of some of the evidence presented at the hearing, however, we cannot say that the district court abused its discretion when it disqualified Charles Register's attorney.

The informant's testimony alone created a situation analogous to those presented in *Hobson* and *Fulton;* in both cases, the defense attorney faced the serious possibility of needing to cross-examine a witness who might give evidence implicating him in his client's criminal activity. *See Hobson,* 672 F.2d at 826; *Fulton,* 5 F.3d at 610. In each case, the court determined that disqualification was appropriate, and we reach the same conclusion here. It would have been virtually impossible for the attorney to question the informant without being concerned to a significant degree about his own interests rather than those of his client. Even if Charles Register had employed backup counsel to conduct this cross-examination (an alternative to disqualification that Charles Register proposed), the jury's perception of the attorney likely would be tainted beyond repair after the presentation of this testimony. *See Hobson,* 672 F.2d at 828-29.[17] This scenario implicates both of the concerns that the Supreme Court in *Wheat* held could justify overriding the presumption in favor of a defendant's choice of counsel: the Sixth Amendment's "guarantee [of] an effective advocate for each criminal defendant," *Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697, and the courts' "independent interest in ensuring ... that legal proceedings appear fair to all who observe them," *id.* at 160,

---

[17]The fact that the government ultimately did not present the informant's testimony at trial does not affect our analysis of the district court's ruling. As the Supreme Court recognized in *Wheat,* the district court must decide this issue prior to trial. *See* 486 U.S. at 162, 108 S.Ct. at 1699. It follows, therefore, that we also must evaluate the propriety of the district court's decision as of that time.

108 S.Ct. at 1698. In sum, we reject Charles Register's argument that the government's evidence was too tenuous to justify the district court's refusal to accept his attempt to waive his attorney's conflict of interest.[18]

We also decline to accept Charles Register's second argument—that the government's conduct suggests that it acted in bad faith to disqualify his attorney for the sole purpose of depriving him of his Sixth Amendment right to be represented by his preferred attorney—as a basis for finding that the district court abused its discretion. We acknowledge that several of the government's actions raise questions about its motivation in moving for the attorney's disqualification. First, the government previously had attempted to disqualify the attorney on the basis of multiple representations; it then waited more than a year before filing another motion to disqualify, this time based upon multiple representations *and* the attorney's own alleged involvement in the defendants' criminal activities. Second, shortly after the district court ordered the attorney disqualified, the government filed the superseding indictment that excluded all RICO charges and, more significantly, omitted all references to "attorneys" participating in the defendants' conduct. On the eve of trial, the government also dismissed the indictment against the codefendant who allegedly plotted with the attorney to submit a false affidavit to recover seized money. These actions diminished, if not destroyed, the relevance of much of the testimony that the government presented at the second *Garcia* hearing. Finally, of the four incidents it claimed justified disqualification, at trial, the government elicited evidence only of the attorney's alleged disclosure to Bilbrey of law enforcement officials' inquiry into one witness's drug activities.

---

[18]The district court classified the conflict of interest based upon the informant's testimony as an "actual conflict." Dist. Ct. Order, R12-150 at 9. In our opinion, the term "serious potential for conflict of interest" more accurately describes these circumstances because, although the government represented to the court at the hearing that it intended to call the informant as a trial witness, an actual conflict of interest would not occur until that situation developed at trial. This distinction does not affect our analysis, however. As the Supreme Court stated in *Wheat,* both actual conflicts and serious potential for conflict can justify disqualification of a defendant's chosen attorney. *See Wheat,* 486 U.S. at 164, 108 S.Ct. at 1700. Indeed, the *Wheat* court noted that

> the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.

*Id.* at 163, 108 S.Ct. at 1699.

Regardless of these facts, we cannot say that the district court's decision was error. Strategic maneuvering by the government to disqualify defense attorneys whom it considered to be formidable opponents was one of the issues the Supreme Court addressed in *Wheat*. Although the Court acknowledged this possibility, it concluded that this concern did not affect its analysis or alter the degree of deference appellate courts must afford to trial courts:

> Petitioner of course rightly points out that the Government may seek to "manufacture" a conflict in order to prevent a defendant from having a particularly able defense counsel at his side; but trial courts are undoubtedly aware of this possibility, and must take it into consideration along with all of the other factors which inform this sort of a decision.

*Wheat,* 486 U.S. at 163, 108 S.Ct. at 1699.

Just as the district court must weigh the likelihood of a conflict of interest developing without the benefit of hindsight, the government also must consider the propriety of bringing a motion to disqualify before it knows the precise course that the trial will take. In this case, the government brought its motion to disqualify the attorney based upon allegations of his involvement in the defendants' criminal activity nearly two years before the trial commenced. In the meantime, a new United States Attorney took over the case, one defendant pleaded guilty, and the grand jury handed down a superseding indictment. It is unlikely that the government fully had developed its trial strategy when it filed the motion, and even if it already had done so, we cannot tell how these and other events influenced one another in the process of generating the case we look back upon today.

What is clear, however, is that both the government and the district court found themselves in potentially no-win situations when the attorney's possible involvement in the drug conspiracy first began to materialize. Had the government decided not to bring this information to the court's attention and had the evidence come to light after the trial, Charles Register could have argued that the conflict of interest deprived him of his right to conflict-free counsel. A similar problem arose in *United States v. McLain,* 823 F.2d 1457, 1463-64 (11th Cir.1987), *overruled on other grounds by United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), in which, unbeknownst to one of the defendants, his attorney was under investigation for criminal conduct by the same United States Attorney's office that was conducting his trial. After the trial

was over, the defendant learned that his attorney and the Assistant United States Attorney trying the case both had been aware of the investigation, and that the government had identified the need to postpone indicting the defendant's attorney until the conclusion of the trial. We ruled that these events deprived the defendant of his constitutional rights and overturned his conviction, noting that the attorney's own interests directly conflicted with those of his client. *See id.* at 1464 (observing that the defendant's attorney's interests were served by a lengthy trial and a refusal to engage in plea negotiations with the government). Similarly, had the government here waited until the trial, or just prior to the trial, to disclose this information to the district court, the prejudice to the defendant would have been even greater because a replacement attorney would have had little time to prepare for trial.

The district court faced an equally difficult problem once the government brought the potential conflict to its attention. As the Supreme Court explained in *Wheat:*

> [T]rial courts ... face the prospect of being "whip-sawed" by assertions of error no matter which way they rule. If a district court agrees to the ... representation, and the advocacy of counsel is thereafter impaired as a result, the defendant may well claim that he did not receive effective assistance. On the other hand, a district court's refusal to accede to the ... representation may [also] result in a challenge....

*Wheat,* 486 U.S. at 161, 108 S.Ct. at 1698 (citation omitted); *cf. Fulton,* 5 F.3d at 614 (reversing conviction after holding that district court improperly accepted defendant's waiver of an actual conflict of interest). This possibility is one of the factors that led the Supreme Court to conclude that appellate courts must allow trial judges discretion in deciding issues of disqualification of counsel due to conflicts of interest; we cannot conclude, based upon the record before us, that the district court abused that discretion in this case.

C.      Notices of Lis Pendens

Charles Register claims that he could not retain Hirsch after the court disqualified his chosen attorney because the government had filed notices of lis pendens against his only assets—two pieces of property allegedly valued at $72,000—in anticipation of seeking forfeiture of those parcels as property used in connection with the criminal activity alleged in the indictment. He contends that the district court erred by refusing to provide him with a post-seizure, pre-trial hearing to determine whether the government had

probable cause to demand forfeiture (and thus to file the lis pendens notices). Charles Register relies upon two tenets of constitutional law: first, that a defendant has a Sixth Amendment right to use his assets to hire an attorney of his choice to represent him; and second, that under the Fifth Amendment, the government must provide due process to those with an interest in property it seizes. Although both of these assertions are, in the abstract, correct statements of constitutional rights, neither applies to the circumstances in this case.

Charles Register does have a right to hire counsel of his choice, although as we explained in Part II.B, the "choice" element of this right is not always absolute. In *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989), the Court addressed the argument that the federal criminal forfeiture statute violated the Sixth Amendment by failing to provide an exception for assets a defendant would use to retain an attorney. Noting its prior holding that " '[[a]] defendant may not insist on representation by an attorney he cannot afford,' " *Id.* at 624, 109 S Ct. at 2652 (quoting *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988)), the Court bluntly stated, "[a] defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." *Id.* at 626, 109 S.Ct. at 2652. The Court used a familiar example to illustrate its point:

> A robbery suspect ... has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended. The money, though in his possession, is not rightfully his; the Government does not violate the Sixth Amendment if it seizes the robbery proceeds and refuses to permit the defendant to use them to pay for his defense.

*Id.,* 109 S.Ct. at 2652-53.

Assets subject to forfeiture are no different from the stolen bank money; they are not rightfully the defendant's. The statute specifically provides that "[a]ll right, title, and interest in property [subject to forfeiture as] described in subsection (a) of this section vests in the United States upon the commission of the [criminal] act giving rise to forfeiture under this section." 21 U.S.C. § 853(c). The Supreme Court approved this procedure in *Caplin & Drysdale,* concluding that "there is a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." *Id.* at 631, 109 S.Ct. at 2655; *see also*

*United States v. Bissell,* 866 F.2d 1343, 1351 (11th Cir.1989) ("[T]he right to counsel of choice belongs solely to criminal defendants possessing legitimate, uncontested assets....  The appellants here had no Sixth Amendment right to use assets to the extent that those assets belonged to the United States.").  In sum, if Charles Register's property was forfeitable, any limitation on his access to those assets could not have violated his Sixth Amendment rights.

Even accepting this fact, however, Charles Register contends that he had a Fifth Amendment right to a pre-trial hearing so that the district court could assess the likelihood that his property would be "adjudged forfeitable" at trial.  *Caplin & Drysdale,* 491 U.S. at 631, 109 S.Ct. at 2655.  Whether the Fifth Amendment requires such a hearing where the government has seized or restrained property in anticipation of forfeiture is a question the Supreme Court pointedly has avoided answering.  *See United States v. Monsanto,* 491 U.S. 600, 615 & n. 10, 109 S.Ct. 2657, 2666 & n. 10, 105 L.Ed.2d 512 (1989) ("*Monsanto III,*" a companion case to *Caplin & Drysdale* ) (where district court had held pre-trial probable cause hearing on forfeiture issue, holding "that assets in a defendant's possession may be restrained in the way they were here based on a finding of probable cause to believe that the assets are forfeitable," but refusing to decide "whether the Due Process Clause requires a hearing before a pretrial restraining order can be imposed.").

Most circuits have addressed this issue either before or after *Monsanto III* and have concluded that the Fifth Amendment requires a pre-trial, though not necessarily a pre-seizure, probable cause hearing.  *See United States v. Jones,* 160 F.3d 641, 647 (10th Cir.1998) (requiring such hearing upon motion of the defendant, where defendant demonstrates that restrained assets are only ones with which she can retain counsel and provide for family);  *United States v. Michelle's Lounge,* 39 F.3d 684, 700-01 (7th Cir.1994); *United States v. Monsanto,* 924 F.2d 1186, 1203 (2nd Cir.1991) ("*Monsanto IV* ");  *United States v. Crozier,* 777 F.2d 1376, 1384 (9th Cir.1985) (addressing same issue in context of restraining order entered ex parte under difference statute and requiring such hearing even where defendant did not allege that he needed assets to retain counsel);  *United States v. Lewis,* 759 F.2d 1316, 1324-25 (8th Cir.1985) (same as *Crozier* but noting that facts implicated Sixth Amendment right);  *United States v. Long,* 654 F.2d 911, 915-16 (3d Cir.1981)

(same as *Crozier* ).  We appear to be the only circuit holding that, although pre-trial restraint of assets needed to retain counsel implicates the Due Process Clause, the trial itself satisfies this requirement.  *See Bissell,* 866 F.2d at 1352-54 (reaching this conclusion after noting lack of significant delay prior to trial and district court's ex parte probable cause determination at time it issued warrant authorizing seizure).  Although, in the appropriate case, we perhaps should re-examine *Bissell* in light of *Monsanto III* and its progeny, this case does not present us with occasion to do so because the action that Charles Register classifies as a "pre-trial seizure" is in fact much less than that.

Here, prior to trial and the jury's finding of forfeitability, the government did not "seize," physically or otherwise, the property in which Charles Register claimed an ownership interest, and it did not obtain a restraining order from the district court preventing Charles Register from disposing of these parcels of real estate.  Instead, the government filed a notice of lis pendens pursuant to Florida law, an action that had the effect of notifying the public (and in particular, prospective buyers or recipients of the land) that the government claimed an interest in the property.[19]  Admittedly notices of lis pendens have the practical effect of impeding an owner's ability to sell property, particularly at its (unrestricted) market value.  As we recognized in *Beefy King Int'l, Inc. v. Veigle,* 464 F.2d 1102, 1104 (5th Cir.1972),[20] "[t]he effect of a lis pendens on the owner of property ... is constraining.  For all practical purposes, it would be virtually impossible to sell or mortgage the property because the interest of a purchaser or mortgagee would be subject to the eventual outcome of the lawsuit."  Still, "the *right* to alienate the property ... exist[s]."  *Chrysler Corp. v. Fedders Corp.,* 670 F.2d 1316, 1323 (3d Cir.1982).

---

[19]*See Black's Law Dictionary* 932 (6th ed.1990) (defining notice of lis pendens as "[a] notice filed on public records for the purpose of *warning all persons that the title to certain property is in litigation,* and that they are in danger of being bound by an adverse judgment.") (emphasis added);  Fla. Stat. Ann. § 48.23(1)("(a) No action in any of the state or federal courts in this state operates as a lis pendens on any real or personal property involved therein or to be affected thereby until a notice of the commencement of the action is recorded in the office of the clerk of the circuit court of the county where the property is ....  (b) ... [T]he filing ... shall constitute a bar to the enforcement against the property described in said notice of lis pendens of all interests and liens ... unrecorded at the time of filing for record such notice of lis pendens....").

[20]Decisions issued by the former Fifth Circuit before October 1, 1981 are binding as precedent in the Eleventh Circuit.  *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

Moreover, even accounting for this practical consequence, notices of lis pendens affect only one incident of ownership—alienability—whereas other methods of securing potentially forfeitable property are significantly more restrictive. *See United States v. James Daniel Good Real Property,* 510 U.S. 43, 54, 114 S.Ct., 492, 501, 126 L.Ed.2d 490 (1993) (observing that outright seizure deprives the interest-holder of "valuable rights of ownership, including the right of sale, the right of occupancy, the right to unrestricted use and enjoyment, and the right to receive rents," leaving him only "the right to bring a claim for the return of title."). Even the most narrowly drawn restraining order legally would forbid the interest-holder to sell the property or do anything to diminish its value.

These distinctions have led the Supreme Court to conclude that the filing of a lis pendens does not implicate a property owner's Fifth Amendment rights. In *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984), the United States filed a notice of lis pendens and complaint of condemnation with respect to a substantial amount of timberland, and the district court eventually entered judgment in favor of the landowner in the amount of the value of the land plus interest from the date the government filed the complaint. *Id.* at 7-8, 104 S.Ct. at 2192-93. The Supreme Court struck down the interest award, reasoning that, prior to the moment that "title passed to the United States," the government never imposed any *legal* restriction on the landowner's use of the property. *Id.* at 15, 104 S.Ct. at 2196. The Court stated:

> It is certainly possible ... that the initiation of condemnation proceedings, publicized by the filing of a notice of *lis pendens,* reduced the price that the land would have fetched, but impairment of the market value of real property incident to otherwise legitimate government action ordinarily does not result in a taking. At least in the absence of an interference with an owner's *legal right* to dispose of his land, even a substantial reduction of the attractiveness of the property to potential purchasers does not entitle the owner to compensation under the Fifth Amendment.

*Id.,* 104 S.Ct. at 2197 (citations omitted) (emphasis added) (footnote omitted).

Similarly, in the civil forfeiture context, the Supreme Court has recommended use of a lis pendens notice as a way for the government to preserve its rights in potentially forfeitable property without need of a hearing and without infringing upon the interest-holder's due process rights. *See Good,* 510 U.S. at 58, 114 S.Ct. at 503 (ex parte seizure violates due process, and government can preserve its interests by using less

restrictive means such as filing a notice of lis pendens); *see also United States v. 408 Peyton Road,* 162 F.3d 644, 651 (11th Cir.1998) (*en banc* ) (quoting *Good* ), *cert. denied*, --- U.S. ----, 119 S.Ct. 1500, 143 L.Ed.2d 654 (1999); *Aronson v. City of Akron,* 116 F.3d 804, 810-12 (6th Cir.1997) (interpreting Ohio forfeiture laws modeled on federal statutes but providing for filing of lien notice with respect to property allegedly subject to forfeiture; comparing liens to notices of lis pendens and concluding that neither triggers due process requirements).

In short, a filing of a lis pendens pursuant to state statute does not constitute a "seizure" and does not affect property interests to an extent significant enough to implicate the Due Process Clause of the Fifth Amendment. Consequently, Charles Register was not entitled to a pre-trial hearing on the legitimacy of the government's claim to his property under the criminal forfeiture statute.[21]

D.      Juror Misconduct

On the morning of the third day of trial, Juror Number 6, who was studying to become a paralegal, sent a note to the court[22] expressing concern that she had overheard Juror Number 9 make a comment to the effect that one of the defendants must be guilty because he was wearing very expensive clothing. The court inquired first of Juror Number 6, who stated that she had overheard Juror Number 9's comment when she was studying and that the comment had caught her attention because it sounded inappropriate. The judge then

---

[21]Although the point does not affect our holding, we note that the remedy Charles Register sought—the retraction of the notice of lis pendens—would not have had any effect upon his ability to compensate Hirsch for his services. According to the forfeiture statute,

> [a]ny such property [that is subject to forfeiture under subsection (a) ] that is subsequently transferred to a person other than the defendant may [still be subject to forfeiture], unless the transferee establishes ... that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

> 21 U.S.C. § 853(c). Hirsch obviously knew that the property in question was subject to forfeiture, and thus even if Charles Register had managed to liquidate these assets and use the proceeds to pay Hirsch, once the jury found the property forfeitable, Hirsch would have had to turn the money over to the government.

[22]Juror Number 6 already had sent another note asking whether she could bring a tape recorder to court so that she could study her lessons during recesses. The court did not allow her to do so.

called Juror Number 9 into the courtroom; she repeatedly denied having formed any opinions as to the guilt of any of the defendants. She admitted having commented about the appearance of some of the participants but stated that she merely had observed that one of the witnesses who was surrounded by "attorneys" was "cute" and that one person was wearing a beautiful suit and very nice shoes.[23] When the judge inquired a final time as to whether she had formed an opinion as to any defendant's guilt or innocence, she replied, "We have 159 more witnesses to listen to. So I think it is impossible to form any opinion at this time."[24] The court denied the defendants' motions to remove Juror Number 9 and, in the alternative, for a mistrial.

On day eight, the court finished charging the jury at 3:55 p.m. It instructed the jury to go into the jury room and decide whether it wanted to begin deliberations or go home for the day and then to let the court know its decision. The jurors left the courtroom at approximately 4:00 p.m.; shortly thereafter they sent a note stating that they would like to leave at 4:30 p.m. and reconvene at 9:00 a.m. The judge called the jurors back into the courtroom and approved this schedule; he then instructed them not to discuss the case with anyone and stated, "We're going home tonight.... Have a pleasant evening."[25] The clerk's notes reflect that the judge excused the jury for the night at 4:35 p.m.

The next morning, the court began by addressing two notes from Juror Number 6. The first, which she had handed the marshal as she was leaving the afternoon before, stated "Your Honor, I ask for myself only. I have knowledge of some laws. Am I permitted to use this knowledge or not to convey to the other jurors? Please let me know your opinion on this."[26] Juror Number 6 sent the second note when she arrived that morning; it stated, "There was mentioned [sic] of a search warrant. Why do we not have it as

---

[23]The defendants contend that Juror Number 9's comments referred to one of them, but the record indicates that at least her first remark and perhaps all of them concerned a witness. *See* Trial Tr., R38 at 477-79.

[24]*Id.* at 478.

[25]*See* Trial Tr., R50 at 2268-69.

[26]Trial Tr., R51 at 3.

evidence?"[27]   The government's attorney then reported that he had observed Juror Number 6's husband speaking with Charles Register's girlfriend—whom the court had allowed to sit at the defense table during trial as his "case agent"—and gesturing at the government's attorney following closing arguments the day before.  He also reported that Charles Register's attorney had approached him after he completed his rebuttal argument and complained that the government's attorney had drawn an inference that a search warrant not introduced into evidence clearly disproved.  Defendants' counsel did not dispute the "gesturing" assertion and otherwise agreed that these events had transpired.  After a short discussion with counsel about how to proceed, the court instructed the jurors to stop deliberating.

The district court observed that based upon this information and Juror Number 6's "inquisitive mind,"[28] it was difficult to believe that no external communication had occurred.  The court listened to the parties' arguments regarding whether it should inquire of Juror Number 6:  the defendants' attorneys wanted the court to ask why she raised the question about the search warrant, whereas the government took the position that the court was authorized to excuse the juror without conducting any further inquiry.  Although the judge stated that he expected her to claim not to have talked to anyone about the case, he took a brief recess to determine whether the law allowed him to excuse the juror without questioning her.  Relying upon *United States v. Barker,* 735 F.2d 1280 (11th Cir.1984), he decided that the better procedure was to inquire of the juror, and after consulting with the parties about what questions to ask, called Juror Number 6 into the courtroom.

When the judge asked Juror Number 6 about her reasons for sending the notes, she replied that because of her knowledge of the law, she "wanted to see if that search warrant was directed specifically to the safe itself.  And if it was, then I want to know why they went out of the scope of consent into the other rooms to get the weapons if they were supposed to go directly to the safe."[29]  She stated that she had not had

[27]*Id.* at 4.

[28]*Id.* at 12.

[29]Trial Tr., R51 at 25.

contact with anyone not connected to the case but that she had been reading her paralegal materials and attending classes. She denied having discussed the case with her husband, although she admitted that he had attempted to talk with her about it. At the conclusion of this inquiry, the court decided to dismiss Juror Number 6 but determined that she had not poisoned the other jurors:

> I am satisfied by the sequence of events in here that this juror is not credible. Her demeanor, her answers, and her conduct throughout the trial, and by the very nature of the inquiries that have been passed in the notes in here, that she does not appear to be credible.
>
> I will now further enlarge upon my reasons for dismissing her: There has been no prejudice, as I can see, to the defendants. As we all know, this jury deliberated for less than a half an hour yesterday. And deliberations, if any, this morning have not taken more than 15 or 20 minutes of time. The other jurors, the alternate jurors, have been here at all times and heard everything that has gone on in the courtroom with the other jury present.
>
> I shall ask that Alternate Juror Number 1 replace this juror, and that we instruct the jury to begin their deliberations all over again from the beginning, and start from there.[30]

All defendants objected both to the removal of Juror Number 6 and the replacement of her with an alternate juror; they moved for the court either to retain Juror Number 6 or for a mistrial. None proposed proceeding with 11 jurors. The defendants also requested the court to ask the remaining jurors whether Juror Number 6 had mentioned the search warrant to them, but it refused.

The court reconvened the entire jury, including the first alternate, and instructed them that they had to "resume [their] deliberations right from the beginning. This [alternate] juror was not in the jury room and has not heard any of the discussions that you had.... [Y]ou have to start all over, right from the beginning, as though you are just being sent out now to discuss this case."[31] The court also reiterated that they were to follow the law as he had given it to them and that considering their own opinions about the law or any information other than the court's instructions would violate their duty as jurors. Finally, the court informed them that they were not to worry about any information that was not in evidence, including any reference to a search warrant. The newly convened jury began deliberating late in the morning on the ninth day of the

---

[30]*Id.* at 27.

[31]*Id.* at 33-34.

trial.  The court dismissed them for the day at 4:45 p.m., and they began again the next morning.  The jury

reached its verdict at 3:00 p.m. that afternoon.

The defendants challenge three aspects of the district court's treatment of the problems that arose with

respect to Juror Number 6:(1) the court's finding that Juror Number 6 was not credible and decision to dismiss

her from the jury;  (2) the court's refusal to inquire of the other jurors to determine whether they had been

prejudiced by exposure to extrinsic information;  and (3) the court's decision to replace Juror Number 6 with

an alternate juror after deliberations had begun.[32]

Federal Rule of Criminal Procedure 23(b) permits the district court "to excuse a juror for just cause

after the jury has retired to consider its verdict."  We review a district court's decision to remove a juror for

abuse of discretion.  *See United States v. Smith,* 918 F.2d 1501, 1512 (11th Cir.1990);  *United States v.*

*Giarratano,* 622 F.2d 153, 157 (5th Cir.1980).  Just cause to discharge a juror exists where the district court

finds evidence that the juror has had improper extrinsic contact, *see, e.g., Barker,* 735 F.2d at 1282 (excusing

juror observed putting her hand on defendant's shoulder and smiling), or where it finds that the juror for some

other reason cannot decide the issues fairly, *see United States v. Geffrard,* 87 F.3d 448, 451-52 (11th

Cir.1996) (excusing juror who expressed inability to follow judge's instructions on the law due to religious

beliefs);  *Smith,* 918 F.2d at 1512 (excusing juror who was upset that jury deliberations would interfere with

plans to spend holidays with family).  When a juror's alleged improper conduct is brought to the court's

attention, the court also enjoys substantial discretion in "choosing the investigative procedure to be used in

checking for juror misconduct," *United States v. Harris,* 908 F.2d 728, 733 (11th Cir.1990), although "[j]uror

misconduct concerning outside influences must be fully investigated to determine if any misconduct actually

occurred and whether or not it was prejudicial," *id.*  We will reverse the district court only if we find that it

discharged the juror "without factual support, or for a legally irrelevant reason."  *Smith,* 918 F.2d at 1512

(internal quotation omitted).

---

[32]The defendants also challenge the district court's decision to retain Juror Number 9 after Juror Number 6 reported overhearing Juror Number 9 drawing inappropriate conclusions about one defendant's guilt on the second day of trial.  We have examined the record and find no error in the district court's decision to retain Juror Number 9.

We conclude that the district court did not abuse its discretion in deciding to discharge Juror Number 6 or in refusing to inquire of the remaining jurors to determine whether they had been tainted by Juror Number 6's conduct. This case had been in trial for nearly two weeks when this incident occurred; the judge had had significant opportunity to observe the jurors and previously had questioned Juror Number 6 in connection with the incident involving Juror Number 9. From the evidence that Juror Number 6's husband had had a conversation with someone close to the defendant the afternoon before, and that Juror Number 6 immediately asked that morning about an issue that the defendants had been upset about the day before, the judge reasonably inferred that a strong possibility existed that Juror Number 6 had engaged in improper conduct and that the defendants indirectly had conveyed extrinsic information to her. Following our instructions in prior cases, however, the judge conducted a brief hearing to determine Juror Number 6's reasons for asking her questions, and she admitted having consulted outside information—her books and classes—during the course of the trial. All of this information was sufficient for the trial court to discharge her because she had engaged in improper conduct.

The defendants emphasize the statement that the judge made before he questioned her—"Let's be practical. I expect her to say that she hasn't talked to anyone"[33]—and argue that this conclusion demonstrates that he improperly decided to excuse Juror Number 6 regardless of her answers to his questions. The district court should not have speculated about Juror Number 6's anticipated response to its questions and should have completed its investigation before drawing conclusions about the propriety of allowing her to remain on the jury. We note that at the time the judge made this statement, however, he had ample information to support a decision to excuse Juror Number 6. Moreover, the court already had complied with our requirement that it must investigate and hold a hearing on the issue of outside influence and its possible prejudicial effect before excusing the juror. *See Harris,* 908 F.2d at 733. In short, our examination of the record reveals both factual and legal support for Juror Number 6's dismissal, independent of the judge's inappropriate remark. His decision therefore was not an abuse of discretion. *See Smith,* 918 F.2d at 1512.

---

[33]Trial Tr., R51 at 13.

The defendants next contend that the judge's determination that the jury had been tainted by extrinsic evidence created both a presumption of prejudice shifting the burden to the government to establish a lack of prejudice and an obligation to inquire of the remaining jurors whether the inappropriate information had influenced their ability to decide the case impartially. The defendants cite *United States v. Martinez,* 14 F.3d 543, 550 (11th Cir.1994) in support of their position. The premise of this argument—that the court concluded that the *jury* had been tainted by extrinsic evidence—is incorrect. In this case, the district court determined that Juror Number 6 had been exposed to inappropriate information, but found no indication that Juror Number 6 had passed that information along to the other jurors.

This case is easily distinguishable from *Martinez,* in which we concluded that the trial court erred in finding lack of prejudice after the jury foreperson sent a note to the judge stating that the jury had debated information about the case that one juror read in the newspaper. *See* 14 F.3d at 547. In *Martinez,* the district court conducted a more thorough probe, questioning each juror individually, only after its initial inquiry of the foreperson (who sent the note) revealed extremely serious concerns about the jury's decision-making process:

> [The foreperson] ... reported that she and other jurors discussed [the offending juror]'s conduct and opinion with her in front of all the jurors. [The foreperson] also stated that she believed [that juror] influenced at least one other juror, and that the jurors argued the entire day of March 19, and all morning on March 20 with some jurors accusing [the offending juror] of harboring prejudice against the government.

*Id.* In contrast with *Martinez,* the initial investigation that the district court conducted in this case did not provide any indication that the jury had deliberated under the influence of extrinsic information.

As the judge noted, Juror Number 6 had little opportunity to influence the remaining jurors as the jury had spent little time together the afternoon before and that morning before he ordered them to stop deliberating. The record also reveals that Juror Number 6's note about independent legal information inquired as to whether she could share her knowledge with the other jurors and stated that she was asking for herself only; that the jurors likely had spent most of the first afternoon developing a schedule rather than discussing the merits of the case; and that she did not send the note about the search warrant until the first morning of

deliberations. All of this information supports the reasonableness of the district court's conclusion that only Juror Number 6 had been exposed to inappropriate outside contact. Moreover, had the court inquired into any possible discussions that the jurors may have had about a search warrant, it risked interfering with their thought processes or overemphasizing the warrant's absence and creating a concern about the issue as a result of the inquiry. Under these circumstances, we find no error in the method the district court employed to investigate the extrinsic contact or in the conclusion it reached that the jury had not been tainted.

Finally, the defendants argue that the district court committed per se reversible error by failing to discharge the alternate jurors prior to the start of deliberations and by impaneling an alternate juror after deliberations had begun. We evaluate this contention "under a *de novo* standard, as it presents a question of pure law." *United States v. Acevedo,* 141 F.3d 1421, 1423 (11th Cir.1998). After the jury charge, the district court directed the alternate jurors to retire to a separate room while the regular jurors deliberated. He instructed them not to discuss the case with anyone, including each other, and told them that they could not leave because the court still might need their services if one of the regular jurors became unable to complete deliberations.

The government concedes that the district court failed to follow Rule 24(c) of the Federal Rules of Criminal Procedure, which states: "An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."[34] We do not apply a per se reversal standard to Rule 24(c)

---

[34]The defendants contend that the district court also violated Rule 23(b), which contemplates a jury of 11 members deciding the case if, after deliberations commence, the judge finds it necessary to dismiss a juror for cause:

> *Jury of Less Than Twelve.* Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than twelve should the court find it necessary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, *if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.*

Fed.R.Crim.P. 23(b) (emphasis supplied). We conclude that the district court's impaneling of the alternate juror in this case did not violate this rule. Although it is true that Rule 23(b) does not explicitly sanction substitution of an alternate after deliberations have begun, this rule simply discusses situations in which 11-member juries are *allowed;* it does not purport to catalog which

violations, however. *See Acevedo,* 141 F.3d at 1423 (citing *United States v. Phillips,* 664 F.2d 971, 994, 996 n. 21 (5th Cir. Unit B Dec.28, 1981)),[35] *cert. denied*, --- U.S. ----, 119 S.Ct. 1048, 143 L.Ed.2d 54 (1999). Instead, we employ the harmless error test and reverse the district court only where "there is a reasonable possibility that the district court's violation of Rule 24(c) *actually* prejudiced [the defendant] by affecting the jury's *final verdict*." *Acevedo,* 141 F.3d at 1424. If the district court took significant procedural safeguarding measures that effectively "neutralized the possible prejudice" to the defendants, and if "[o]n the record before us we cannot discern that appellants were prejudiced by the substitution," we will uphold the verdict. *Phillips,* 664 F.2d at 996.

In *Phillips,* the jury had deliberated for one and half days when one juror became too ill to continue. Before impaneling one of the retained alternate jurors, the court took several steps to ensure that the substitution would not prejudice the defendant: it "sequestered the alternate during the preliminary jury deliberations," questioned the jurors individually about their ability to set aside their previous discussions, and instructed the newly impaneled jury to start its deliberations over from the beginning. *Phillips,* 664 F.2d at 996; *see also Barker,* 735 F.2d at 1282-83 (noting that trial court "meticulously met the demands of *Phillips,*" including ascertaining "that the jury could proceed on an impartial basis and begin its deliberations over again," explaining the original juror's excusal in a nonaccusatory manner, instructing the jurors "to begin anew," and hearing no expression by any juror of an inability to follow these instructions).

In this case, the judge also took precautions to make sure that the deliberations of the newly impaneled jury were fair. The court required the alternates to wait in a separate room when the original jury retired to deliberate and instructed them not to discuss the case. After Juror Number 6's dismissal, the court called the eleven remaining jurors and the two alternates into the courtroom, reinstructed them on the importance of applying the law as he had given it to them without considering information not in evidence,

---

of the full range of possible resolutions of problems presented in the case are permitted and which are forbidden. Thus, Rule 23(b) does not expressly or by implication prohibit the course of action the district court chose.

[35]Decisions by Unit B of the former Fifth Circuit issued after September 30, 1981 are binding on this court. *See Stein v. Reynolds Sec., Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

and repeatedly told them that they must start over as if they never had begun their deliberations because the alternate juror needed to participate fully in the decision-making process. Although concededly these measures were not as thorough as those described in *Phillips,* we note that stronger precautions may have been necessary in that case because the original jury already had deliberated for one and a half days when the substitution occurred. Here, in contrast, the jury had had the case for less than one hour.

As the *Phillips* case emphasizes, the ultimate question we must decide is whether the record indicates a reasonable possibility of prejudice to the defendants. Specifically, we noted in *Phillips* that "[t]he most substantial concern about substitution of an alternate juror after deliberations have begun is that the alternate might be coerced by jury members who might have already formulated positions or viewpoints or opinions." 664 F.2d at 995. Given the brief time that the original jury deliberated in this case, and that the record reflects that it spent a significant portion of that time on procedural, rather than substantive, matters, we do not think the substitution prejudiced the defendant. The court impaneled the alternate juror late one morning; the new jury then deliberated the rest of that day, started again the following morning, and reached a verdict at 3:00 p.m. in which they found each defendant guilty of some counts and not guilty of others. Under these circumstances, the only reasonable conclusion we can draw is that the alternate juror participated fully and impartially in reaching the final verdict. In sum, the district court's failure to follow the letter of Rule 24(c) or to avail itself of Rule 23's 11-member jury option did not prejudice the defendant, and the court's error, therefore, was harmless.[36]

---

[36]Finally, we note a recent proposed change in Rule 24(c) reflecting that the Supreme Court now considers the exact procedure employed by the district court in this case to be a perfectly acceptable method of addressing situations in which it must discharge a juror after deliberations have begun:

> Retention of Alternate Jurors. When the jury retires to consider the verdict, the court in its discretion may retain the alternate jurors during deliberations. If the court decides to retain the alternate jurors, it shall ensure that they do not discuss the case with any other person unless and until they replace a regular juror during deliberations. If an alternate replaces a juror after deliberations have begun, the court shall instruct the jury to begin its deliberations anew.

Fed.R.Crim.P. 24(c)(3) (proposed April 26, 1999). This rule, announced by the Supreme Court, intimates that such a procedure does not deprive defendants of any rights. It will take effect December 1, 1999 unless Congress provides otherwise.

AFFIRMED.